CHARLES MORRIS, JR., a minor, by CHARLES MORRIS, next friend,

*Plaintiff and Appellant,*

vs.

JAMES K. JACKSON and BERNICE E. JACKSON, *Defendants and Respondents.*

(No. 2442; December 6th, 1949; 212 Pac. (2d) 78)

370

For plaintiff and appellant the cause was submitted on the brief and oral argument of L. C. Sampson of Cheyenne, Wyoming.

For defendants and respondents the cause was sub-
mitted on the brief and oral argument of Carleton A.
Lathrop of Cheyenne, Wyoming.

## OPINION.

RINER, Chief Justice.

This is a direct appeal proceeding brought by Charles Morris as the next friend and father of Charles

Morris, Jr., a minor, to obtain, as plaintiff and appellant, the review of a judgment of the District Court of Laramie County denying a writ of habeas corpus sought by the father aforesaid and awarding the custody of this minor child to James K. Jackson and Bernice E. Jackson, the defendants and respondents here.

The facts necessary to be considered are substantially as follows: Charles Morris and Ena Perry Morris, the mother of the child involved in the present proceedings, were married in the State of Florida on September 12, 1942. This child, according to his father's testimony and his mother's written statement which accompanied the petition for adoption presently to be mentioned, was born December 10, 1942 in the state above mentioned. It appears also that Charles Morris had previously contracted a marriage and had been divorced. By his first wife he had three children, one being a boy who was at the time of the trial of the instant case, about seventeen years old, and another, a girl twelve years old, the sex and age of the third child not being given in this record. The mother of these three children according to the father's testimony resides in Troy, New York. It also appears from the same testimony that their custody had been awarded to their mother and she has cared for and supported them ever since the divorce. Morris stated as a witness in the case at bar that she was "amply able to take care of those children" and that he has not supported them and was not doing so at the time of the trial of this case in the District Court.

Thereafter, apparently some time in 1945, Morris instituted divorce proceedings against his wife, Ena, in the State of Georgia. She filed a cross complaint in that action and on September 11 of that year she was granted a final divorce from him. Meanwhile and on August 13, 1945 upon the consent of both parties

through their counsel in that proceeding, the custody of the minor, Charles Morris, was assigned by the Georgia court to the mother, Ena Parry Morris, to be held by her during the nine months school year and to the father during the three months summer vacation periods. It was also directed by the court last mentioned that the child's father should pay to the mother "for the support and maintenance" of their child "$30.00 per month during the nine months or for any other additional months that she might have said child in her custody."

The father seems to have made the payments thus ordered until the latter part of February, 1946 when he learned that the mother had taken the child out of the State of Georgia and gone to Denver, Colorado. In June 1946 Morris with his present wife, Joan Dorothy Westfield, and her mother came to Denver, where, though they were not then married, they lived together as man and wife, as she testified, with her mother's approval. At that time Ena Perry Morris, the mother of the child here involved, appears to have placed him with the Colorado Children's Aid Society. June 19, 1946 a hearing was had in the Juvenile and Family Court in and for the City and County of Denver, State of Colorado. At this hearing the Society was present petitioning to have Charles Morris, the minor child aforesaid, declared "dependent and a ward" of that court; and also Charles Morris, the father, was represented by his counsel and was, besides, present in person. The result of that hearing was an order granting custody of this minor child to the Society and directing his father to pay the sum of $35.00 a month for his support and maintenance, the first payment thereof to commence July 1, 1946. Subsequently five payments of $35.00 each were made by Morris through his attorney to the Society on account of his minor child ordered by the Denver Juvenile Court, the last

payment being made November 7, 1946. Meanwhile Joan Dorothy Westfield and her mother went with Morris to California the latter part of June, 1946 where she and her mother were supported by Morris until November 28, 1946 when these three people, Morris, Joan Dorothy Westfield and her mother, returned to Denver. Previously thereto, Joan on September 30, of that year had borne a child by Morris. These three people stayed in Denver about a month and a half, eventually returning to La Grange, Georgia after that period had elapsed. Morris did not however, marry Joan Dorothy Westfield until December 28, 1947.

On February 11, 1947 the representative of the Colorado Children's Aid Society and the attorney for the mother, Ena, of Charles Morris, a minor, came before the Juvenile Court above mentioned and an order was then made relative to the child's custody wherein it was ordered that "custody of said child be placed with said mother, respondent, Ena Morris Jones, and that his custodial care be given to the Colorado Children's Aid Society." The mother by this same order was directed to pay $17.50 each two weeks beginning February 21, 1947 "until the further order of the court"; and Charles Morris Sr., the father of said child, was by this same order "denied the right of visitation with said child until said cause has been re-opened by said father, respondent".

On March 20, 1947 a representative of the Society aforesaid and Ena, the mother of the minor, Charles, appeared once more in person before said Juvenile Court and a further hearing was had to the court concerning the custody and support of the minor, Charles Morris. On that hearing it was ordered that "said child be returned to the custody of his mother, Ena Morris Jones, respondent herein, until the further

order of the court herein on a probationary basis." The court found that at that time there was due the Society aforesaid for the care of this child while he was in their custody, the sum of $125.00 which amount the mother was directed to pay to the clerk of said court at the rate of $25.00 monthly until this debt was liquidated.

Of these two last mentioned orders the father, Charles Morris, seems to have had no actual or personal notice—at least he so testified and the testimony seems not to be contradicted. At any rate he did nothing to have these orders altered. He seems not to have made any further payments in aid of his child, Charles Morris by Ena Perry Morris than as above set out. Yet he stated as a witness in the case at bar that from June 20, 1946 to November 28, 1946 he worked for the War Assets Administration, his yearly salary being $3,397 base pay. He also stated that in December, 1946 he was in Denver, not working, and unable at that time to pay $35.00 for the support of the child involved herein.

It is not clear when Mrs. Ena Perry Morris (Jones) brought the child, Charles Morris, to Cheyenne, but probably that was some time after May, 1947. The child, Charles Morris Jr. evidently came into the possession of Mrs. Jackson, one of the respondents in the instant proceeding, the latter part of July, 1947. The mother left him with Mrs. Jackson for about six weeks while she (the mother, Ena) returned to Denver to find a place to stay as Mrs. Jackson testified. However, she returned to Cheyenne once more and suggested to the Jacksons that they adopt the child. About January 27, 1948 they went to Denver and obtained the mother's written consent to the adoption of this child by them. When the child came into Mrs. Jackson's possession his clothes were, as she testified in the District Court, "all

just in rags. He had holes in his stockings" and his "shoes were running down at the back". This situation the Jacksons corrected by buying him proper clothing, supporting him, and giving him a place to live in their home. They endeavored to find out from the mother where the father was living but apparently were unable to do so as Mrs. Jackson testified. He had left Denver and she did not know where he was.

It is admitted by the pleadings in this case that on February 10, 1948 the defendants and respondents herein, James K. Jackson and Bernice E. Jackson filed in the District Court of Laramie County their petition for adoption by them of the minor child, Charles Morris aforesaid; that this petition was accompanied by the written consent of the mother to such adoption duly acknowledged January 27, 1948; that she thereby relinquished all her rights to said child. In the written consent so given she stated that she had sole custody of this child awarded her by the Denver Juvenile Court order of March 20, 1947 above described. An order of adoption was passed April 1, 1948. The petition for the writ of habeas corpus, herein, attacks the validity of these adoption proceedings.

The father, Charles Morris, and his present wife Joan Dorothy Westfield Morris came to Wyoming in August, 1948 after he had located the child, Charles Morris, through the efforts of his Denver Counsel. He contacted the Jacksons and demanded the custody of the child from them. They declined to surrender him. The boy was about six years old at the time of the trial of the habeas corpus proceeding which the father then brought in the Laramie County District Court to obtain the custody of his son.

On the trial of that action Charles Morris, the father testified that he received no notice, either actual or by publication, of these adoption proceedings. The

record before us bears out that statement, despite the District Court's finding in its final judgment herein that the adoption proceedings should not be held invalid. We have already described the terms of the orders made by the Juvenile Court of Denver and of which the father claims also he had no notice. As before stated there seems to be no proof that he did have such notice.

Section 58-206 W. C. S., 1945 provides:

"When a petition is filed and presented to the district judge, praying for the adoption of a child or children, unless said petition is accompanied with the written consent of the living parents of said child, such judge shall by written order set such petition for hearing and require such parents who are living to appear on the day set and show cause why such petition should not be granted and an order of adoption made thereon."

Section 58-207 further provides:

"A copy of the petition and the order made thereon shall be served on the parents of such child who have not consented to the adoption, who can be found in the state, at least ten (10) days before the day specified in the order for the hearing. When such parents cannot be found in the state, and such fact is made to appear by affidavit of one of the petitioners for adoption, setting forth the last known address of such living parents, such order shall be published once a week for three (3) successive weeks in a newspaper of general circulation in the county, as the court may direct, the last publication to be at least twenty (20) days before the time appointed for the hearing, and a copy of said notice shall be immediately mailed to the last known address of said parent. Parents served personally or by publication as herein provided, shall be bound by the findings and judgment of the court respecting such adoption as defendants served with process in a civil action."

These two sections of our statutes were not followed by the defendants and respondents herein, evidently

relying upon the Colorado Juvenile Court orders aforesaid. However, we have grave doubt as to whether those orders as this record discloses them to us gave exclusive custody of the minor child to the mother, Ena Perry Morris, or that if they did, Charles Morris, the father, had notice of and was bound by them. We shall assume, disregarding the District Court's finding mentioned above, therefore, that the adoption proceedings instituted by the defendants and respondents were without effect as to the father, Charles Morris. He, as petitioner in the habeas corpus proceeding now under review, asserts that if the adoption order was invalid, it must follow that the writ was erroneously denied by the District Court of Laramie County. We can not agree that this is so. We should note before proceeding further with this opinion that the trial court in addition to its findings mentioned above found generally in favor of the defendants and respondents and that "the custody and control of said minor child should not be awarded to Charles Morris, the father of said child."

When a writ of habeas corpus is sought for the purpose of determining the right to the custody of a child, the investigation ordinarily should and does extend quite beyond the issues which a request for the writ ordinarily involves. The problem does not embrace in matters of this kind, the question of personal freedom and liberty because a minor child for perfectly humane and clear reasons is presumed to be in the custody of some adult person until the child has attained its majority. These matters are accordingly dealt with by the court generally as matters of an equitable nature. The mere legal right of a parent or guardian while it should duly be taken into consideration and given proper weight in such proceedings, is viewed as a claim based upon human nature and generally equitable and just.

So 25 Am. Juris., Section 80, page 205 treating of contested cases of this nature declares that they:

"are decided not upon the legal right of the petitioner to be relieved from unlawful imprisonment or detention, as in the case of an adult, but on the court's view of the best interests of whose welfare requires that they be in custody of one person or another; and hence, a court is in no case bound to deliver a child into the custody of any claimant or of any person, but should, in the exercise of a sound discretion, after a careful consideration of the facts, leave it in such custody as the welfare of the child at the time appears to require. In short, the child's welfare is the supreme consideration, irrespective of the rights and wrongs of its contending parents, although the natural rights of the parents are entitled to due consideration."

This text further says in the same section, pages 205-206 that:

"An application, through the medium of a habeas corpus proceeding, for the custody of a child is addressed to the discretion of the court, and such custody may be withheld from the father where it is made clearly to appear that by reason of his unfitness for the trust or of other sufficient causes, the permanent interests of the child would be sacrificed by a change of custody from another to him."

Similarly 39 C. J. S. 572-573, Section 41b states that:

"The paramount considerations and issues in habeas corpus proceedings involving the custody of a minor child are the welfare and interest of the infant. However, while being guided by such accepted principles, the court must always carefully examine into the peculiar and special facts and surroundings in each case."

This text points out too that "the legal right of the parent is secondary to the best interest of the child, and such right will not be enforced where it is not advantageous to the child."

The Supreme Court of Pennsylvania in Commonwealth ex rel. vs. Daven et al., 298 Pa. 416, 148 Atl. 524 discussing the same subjects has very well said:

"Orders fixing the custody of children are temporary in their nature and always subject to modification to meet changed conditions. In the instant case it was expressly so made. The cardinal consideration is ever the welfare of the child, which includes its physical, intellectual, moral and spiritual well being. To this the rights of parents and all other considerations are subordinate. Moreover, the controlling question is the welfare of the child at the time of the hearing before the court and not at some former time."

See also Wells vs. Stranger et al., — Mont. —, 207 Pac. 2d 549.

We have heretofore, and not so long ago either, declared in Kennison vs. Chokie, 55 Wyo. 421, 100 Pac. 2d 97 that:

"the paramount question at all times, when the custody and control of a minor child is in dispute, is the welfare of such child. That has been declared to be the rule by this court a number of times."

As illustrative of this principle there are in that case cited: Jones v. Bowman, 13 Wyo. 79, 77 Pac. 439, 67 L. R. A. 860; Tytler v. Tytler, 15 Wyo. 319, 89 Pac. 1, 123 Am. St. Rep. 1067; Harris v. Muir, 24 Wyo. 213, 157 Pac. 26; Madson v. Humane Society, 25 Wyo. 338; 169 Pac. 336; Stirrett v. Stirrett, 35 Wyo. 206, 248 Pac. 1; Curran v. Curran, 51 Wyo. 217, 65 Pac. 2d 243.

Being guided by these general principles, the powers of the court when adoption proceedings are found to be invalid and the welfare and best interests of the child or children are up for consideration, are, we think, appropriately disclosed in the brief review of the following appellate court decisions:

The case of In re. Bistany, 209 App. Div. 286, 204 N. Y. S. 599 was one where Bistany and his wife sought to adopt a child, Ellen Matejka, asserting in the adop-

tion proceedings that this child's parents, Joseph and Susan Matejka had abandoned her. The county court allowed the adoption and upheld the proceeding therefor. On appeal to the Supreme Court Appellate Division (see the citation last above given) this view of the matter was held to be erroneous and the order of adoption was reversed and vacated. In rendering this judgment the reviewing court said in part:

"We think it is impossible, upon all the evidence, to hold that the parents abandoned the child. The result is a painful situation. The petitioners, with all the yearning that comes to childless people, have taken this little girl into their hearts and lives. The child herself has lost memory of and love for her parents. Those things must now be by them reawakened and called back. The pleasant surroundings and the material comforts of well-to-do people must be lost to the child, in exchange for the life and living conditions in the crowded East Side district of New York. In one aspect these things are to be regretted. But, on the other hand, the primal instincts and the natural and legal rights of the parents may not be lightly brushed aside. . . . Some degree of hardship, if hardship it may be called to live under the parental circumstances, is not necessarily to be deplored. In any event, in this proceeding, those matters are but remotely involved. Until the fact of abandonment has been proved, the petitioners can have no standing, and the comparative affluence of petitioners and parents may not be considered, except as a circumstance bearing on the probabilities of that issue."

Dissatisfied with this ruling, Joseph K. Bistany and his wife Katherine sought its review in the New York Court of Appeals (In the Matter of the Application of Joseph K. Bistany et al appellants, 239, N. Y. 19, 145 N. E. 70 for the Adoption of Ellen Matejka) but the order made by the appellate division was affirmed, Judge Cardozo writing the opinion and concluding with this paragraph:

"Stress has been laid in argument upon the welfare of the child, her prosperity and happiness. We do not dwell upon such considerations, for they are foreign to the issue. We digress merely to state that nothing in this record gives color to a suspicion that the parents are actuated by any sinister design. If the proceeding were habeas corpus, to determine custody alone, there would be need to consider whether the welfare of the child might be held to be controlling. The petitioners ask for more than custody. They seek to make the child their own."

Thereafter the parents of the child, Joseph and Susan Matejka sought by habeas corpus to take the child, Ellen, from the Bistanys. The trial court, however, dismissed the writ. This ruling was affirmed by the Supreme Court Appellate Division (People ex rel. Joseph Matejka et al vs. Joseph Bistany et al, 221 App. Div. (N. Y.) 879). Upon the appellate jurisdiction of the court of appeals being again invoked by the natural parents of Ellen (People ex rel. Joseph Matejka et al vs. Joseph Bistany et al 249 N. Y. 581, 164 N. E. 591) the order denying the writ of habeas corpus was again affirmed by an unanimous ruling of the court last mentioned. There was no opinion filed but the memorandum decision stated that the writ of habeas corpus had been dismissed "on the ground that a prior decision of the court that the child's interest would be best promoted by her remaining with defendants was res adjudicata" and Matter of Bistany, 239 N. Y. 19 (above referred to) was cited.

The two cases of In re Sulewski et al and Commonwealth Ex rel. Marcques et al vs. Rodiques et al, 113 Pa. Super. 301, 173 Atl. 747 was a matter where there were two appeals involved. There were proceedings in the Matter of the Petition of Martin J. Sulewski and Mary, his wife, for the Adoption of Rose Marcques and Dolores Marcques, minors, and also habeas corpus by the Commonwealth on the Relation of these minors

by their mother and next friend Susan Marcques Santos against Joseph Rodiques and another. These appeals were taken, one from the decree of adoption, the appellant being Susan Marcques Santos and the other from an order dismissing the habeas corpus proceeding, the relators being the appellants. Reversing the decree of adoption the court said:

"Unless the requisite consents declared by the act of assembly to be necessary are obtained, or there is a specific finding that both the father and the mother of the children have abandoned them, a decree of adoption cannot be entered. The welfare of the children is not sufficient ground for the decree of adoption, unless based on the necessary consent of the parents, or on the distinct finding that the parent or parents not consenting have abandoned the children. The fact that the adoption asked for may be advantageous to the children and for their material welfare is not to be considered by the court until the necessary prequisites for such action exist."

The record therein was remanded to the court below:

"with directions to refuse the adoption and dismiss the petition, unless the court specifically find from the evidence that both parents have abandoned said children."

The order denying the writ of habeas corpus was affirmed and this was said in part concerning that matter:

"It does not follow that, because the decree of adoption has been reversed, the custody of the children must be given to the appellant, their mother. Darlington's Adoption, 69 Pa. Super Ct. 281. The court decided that it would be for the best interests of the children that they stay with Mr. and Mrs. Sulewski."

The foregoing ruling of the Superior Court was approved by the Supreme Court of Pennsylvania in Schwab Adoption Case, 355 Pa. 534, 50 Atl. 2d 504.

In Fielding vs. Highsmith, 152 Fla. 836, 13 So. 2d 208 the material facts were as follows: The proceeding involved was habeas corpus instituted by Highsmith against Libby Rush Fielding and her then husband to recover custody of plaintiff's minor daughter. The judgment brought up for review awarded the custody of this child, Johnnie Lou, to the plaintiff. The petition for the writ attacked the validity of another proceeding—that of adoption brought by Libby Rush Fielding (then Libby Rush) for the adoption of Highsmith's minor daughter on the ground that the order of adoption was entered without notice to him. This was filed in the same trial court as that wherein the application for the writ of habeas corpus was subsequently filed. On final hearing in the proceeding instituted by the father the trial court found that the father was a fit and proper person to have it and so awarded him the custody of the child. The lower court seems not to have directly passed upon the validity of the adoption proceeding. The appellate court, however, assumed that that court treated the adoption as without effect and hence the father as the natural parent had the paramount right to the child. The reviewing court, however, said:

"In the present case, it is clear from the testimony that consent to the adoption was not procured from the natural parent nor was notice given, or attempted to be given, of the adoption proceedings, although the father could have been located by diligent search and inquiry. We must hold, therefore, that as a matter of law the order of adoption is invalid as against the father."

After thus concluding relative to the adoption matter the court, however, then remarked:

"It does not necessarily follow this holding, however, that the custody of the child must go back to the father in all events. This is a habeas corpus proceeding brought primarily to determine the custody of a minor

child, even though in the process the validity of the adoption proceedings is incidentally involved. In such proceedings the moral, intellectual and material welfare of the child are the matters of chief importance, Bourn v. Hinsey, 134 Fla. 404, 183 So. 614, and the infant should be placed where its interest will be best subserved, without regard to the validity or invalidity of the adoption proceedings. Of course all things being equal, the legal right of the father will generally prevail. But the rights of the parent are not absolute; many other factors must be taken into consideration. 'The ties of nature and of association, the character of the applicant for the child, its age, health, and sex, the moral or immoral surroundings of its life, the benefits of education and development, and pecuniary prospects, as well as many other considerations, enter into the judicial determination.' Marshall v. Reams, 32 Fla. 499, 14 So. 95, 96, 37 Am. St. Rep. 118."

The record in the habeas corpus matter above mentioned disclosed that the child's mother had died when Johnnie Lou was only three years old. She left her husband, Dan Highsmith, and nine children surviving. Two of these were married and had their own homes. The others lived with their father. After the mother died one of these married sisters of the child, Mrs. Beatrice Rogers, took the child to live with her apparently with the father's approval. In this home the child lived until she was six years old. At that time Mrs. Libby Rush visited in the Rogers home, met Johnnie Lou there and was attracted to her. Mrs. Rogers suggested that Mrs. Rush take Johnnie Lou to the latter's home in another city. This was done. It seems the father agreed to this arrangement also. For seven years the child lived in the home of Mrs. Rush (subsequently Mrs. Rush Fielding). During that time the father did not see the child and made no effort to do so. Mr. Fielding whom Mrs. Rush married owned his own home and held good employment and was sober, respectable and industrious; he and his wife had a good reputation in the community where they lived. There

was a strong mutual attachment between the foster parents and Johnnie Lou, who seems to have expressed a preference to remain with them. This was the only home she ever knew. She had forgotten her father and the rest of her father's family. Highsmith had remarried and was employed as a workman at a Naval base. Johnnie Lou had never seen the step mother prior to the hearing on the habeas corpus proceeding.

The result reached by the appellate court in the case and its further views upon the record are reflected in the concluding portion of the opinion thus:

"What might be her future if she were taken from her present home and placed in new surroundings with virtual strangers is highly problematical.

"There are cases where parental rights must yield to the feelings, interests, and rights of others. We think that this is such a case. The foster parents have looked after the child's social, moral and educational interests for seven years, and the child, itself, has become attached to the environment and the people who have made possible the happiness of its early years. The father has neglected her and allowed such attachment to ripen. Under such circumstances the fixed relationship of the child and its foster parents cannot be changed without seriously risking the future happiness of the child.

"The order is reversed and the cause remanded for the entry of a judgment awarding the custody of the child to the appellants."

Other cases may be found expressing similar views upon substantially similar facts. The foregoing resume of case law does not undertake to be exhaustive. While these cases are not in all respects precisely similar to the situation now before us through the instant litigation they do in the controlling principles applied and in a great many of their important facts afford material aid to us in reaching a proper conclusion herein.

In the case at bar the father of the child, Charles Morris has been married twice previous to his marriage which now subsists. His marital and moral history as above detailed can at the very most hardly be said to be of an exemplary character. He seems to have not troubled to concern himself with the welfare or support of the children of his first marriage. Under court order he has to some extent supplied support for the child whose care and custody are here involved, though at times he does not seem to have tried very hard to keep in touch with the boy. When petitioner called at the Jackson home in his effort to get control of the child before these proceedings for the writ were commenced, the boy saw his father but failed to recognize him. The child is contented and happy in the Jackson family life and a bond of mutual affection has grown up between him and these good people who have taken him into their home.

The Jacksons own a substantial brick house of nine rooms and the child has a room of his own therein. Mr. Jackson has a responsible position with the Union Pacific Railroad in its train service and receives an average salary of at least $500.00 a month. He has been in this service between seventeen and eighteen years in the City of Cheyenne. Since coming into the custody of the defendants and respondents they have purchased for him a complete wardrobe of clothes, three suits, overcoat, hat, etc. He came to them without enough clothing to keep his body warm, practically barefoot and as before indicated, in ragged clothing. In brief Mr. Jackson and his wife are so situated as to be able to supply this boy with those things which make for his true happiness, well being, mentally, morally, and physically as well as aid greatly in his growing up to be a good and useful citizen wherever the paths of his life may lead him.

The father of the child as we have seen and as the record shows has moved from one place to another quite frequently. He has not had steady employment. At the time of the trial in the court below he was living in the town of Carpenter, Wyoming in what he referred to as "the teacherage" in a five room apartment there. He testified that he directs the school band and chorus—Junior and Senior High School—in the town last mentioned. He also plays as a musician in a dance orchestra every week end and goes from one town to another in the states of Wyoming and Nebraska in the course of this employment.

Without further reviewing here the past record of the father and his present circumstances than has hereinbefore been done as compared with that of the home in which the child now is and having in mind the paramount test of the child's best interest and welfare, we are clear in our view of this matter, that the District Court of Laramie County committed no prejudicial error in directing that as the case now stands the child's custody should remain with the defendants. The judgment of the District Court of Laramie County in that respect denying the writ of habeas corpus and remanding the minor child, Charles Morris to the custody of James K. and Bernice E. Jackson should be affirmed.

*Affirmed.*

KIMBALL, J. and BLUME, J. concur.