719 P.2d 1373 (1986)
In the Matter of the ADOPTION OF BGD, a Minor.
TD, By and Through her next friend and parents JD and ZD, Appellants (Plaintiffs),
v.
LDP and MFP, Appellees (Defendants).
No. C-85-1.
Supreme Court of Wyoming.
May 30, 1986.
Before THOMAS, C.J., BROWN,[*] CARDINE,[**] URBIGKIT,[***] JJ., and RAPER, J., Retired.

ORDER ON REHEARING
This case came on before the Court pursuant to Order Granting Petition for Rehearing and Denying Petition for the Appointment of Weston County DEPASS as Guardian Ad Litem to Investigate the Parties to Aid in Determining What is in the Best Interest of BGD, a Minor, and Denying Motion to Disqualify Supreme Court Justices entered on March 28, 1986, 716 P.2d 983, and the Appellees' Brief on Order Granting Rehearing and the Appellant's Answer, and the Court having heard the oral arguments of counsel for the parties, and having examined the file and record of the Court and the opinion of the Court in this case which was filed on February 14, 1986, 713 P.2d 1191, and being fully advised in the premises, finds that the opinion of the Court filed on February 14, 1986, should be confirmed in all respects; and it therefore is
ORDERED that the opinion of this Court filed in this case on February 14, 1986, be and the same hereby is, confirmed.
BROWN, Justice, specially concurring, in which RAPER, Justice (Retired), joins.
It was with a heavy heart that I voted with the majority in this court's decision of February 14, 1986. It was equally difficult to join the majority in confirming the court's original opinion. A judge is no stranger to difficult and unpopular decisions. However, he must vote according to his conscience and uphold what he perceives to be the law.
After the court's opinion of February 14, 1986, the Supreme Court was inundated with letters urging us to change our determination, which is unfortunate. Over fifty of these letters were directed personally to me. It was reported that one of those *1374 active in the letter writing campaign said: "I think the publicity and the letter writing campaign * * * probably helped" (obtain a rehearing). Casper Star Tribune, May 29, 1986; Newcastle Newsletter Journal, April 3, 1986.
Those who organized the letter writing campaign misconceived the judicial process. A judge cannot properly be influenced by public opinion or pressure. I wish to assure the public that the letters did not have any influence whatsoever on the court's decision to grant a rehearing. It would be totally improper for the court to succumb to pressure or be influenced by public opinion. Those interested in this case must understand that the courts cannot tinker with the rules in order to accommodate one circumstance. The law applies the same to everyone in the state.
If I ever make a decision based upon pressure or because of public opinion instead of my own professional judgment, I would have to resign from this court. In that circumstance I would have compromised my principles, violated my oath, sacrificed my integrity, and no longer be of any value to the court. The other members of this court feel the same way.
CARDINE, Justice, specially concurring, with whom BROWN, Justice, and RAPER, Justice, Retired, join.
The only question presented on rehearing is whether the court correctly interpreted and applied § 1-22-109 and § 1-22-104, W.S. 1977 to the facts of this case. A review of these facts is helpful in answering that question.
TD, a young, unwed, pregnant girl employed a doctor to deliver her baby. The doctor's office manager MFP, wanted to adopt a baby. The doctor discussed the "possibility [of adoption at] nearly every visit" of TD. He advised MFP that "we have a baby that will be available." On March 15, 1983, seven days before the birth of baby girl D, the doctor advised TD that he knew a lawyer who handled adoptions. The doctor then testified,
"I phoned him stating that I had a young lady who was interested, asked if he would see her * * * could he see her at the same time she came for the appointment, could he please tell her about the legal aspects. I did not ask [the attorney] to prepare any form, and I did not ask [TD] to sign anything. I did ask her to please go and talk to him about the legal aspects * * *.
When TD returned from the lawyer's office after signing a consent to adoption, the doctor testified,
"I was surprised. I did not realize she was going to sign anything that day. My only basis for sending her was for her to gain information about legal aspects of this procedure."
The lawyer testified,
"I had been called by Doctor Reimer and advised they were in town and would be coming down to see me, the purpose being to sign a Consent for Adoption, for her to give up her parental rights to a child."
The lawyer, who had been employed by MFP and had previously prepared the consent form, advised TD that it "would be necessary for her to sign."
Baby girl D was born March 22, 1983. The doctor had previously told TD concerning the adoption, "you can change your mind at any time." TD testified that she informed the doctor in the delivery room before the birth that she wanted to keep her baby. The doctor testified,
"I do not recall that exact statement. I certainly do know that she was ambivalent about this, and, you know, a part of her did not want to do this, and she may have said that to me and I do not recall that exact statement."
Whatever the situation, the doctor admits that he lied to TD when he told her that it was too late to "keep her baby" because the adoptive parents were flying in from California. That evening, seven hours after baby girl D was born, the doctor took the baby from the hospital to his home where he delivered it to his office manager *1375 MFP and her husband LDP, the prospective adoptive parents.
During trial the judge said to the doctor, who was on the witness stand,
"THE COURT: Doctor, let me say to you, * * * who are you representing here? Don't you realize you've put yourself in a predicament? I hope you don't ever do that again. Now, were you representing the adoptive parents or were you representing this girl who had the baby? You can't carry water on both shoulders, and that's what you're trying to do."
Shortly after the birth of her baby, when it was still at the hospital, TD called the lawyer and said,
"I told him that  I asked him if the parents would change their mind on the adoption and that I wanted her back, and he told me that I was 16 years old and I wouldn't be able to take care of a baby and also that if I wanted another baby I could have another one; and that's when I told him that the adoptive parents can adopt another baby and they don't have to have mine."
The next morning TD asked to see her baby and was told it was gone. TD then checked out of the hospital fast "so I could go home and start trying to find a lawyer."
In this case the adoptive parents contend that they should prevail because they have had possession of baby girl D for approximately three years, and because they are financially better able to provide for her. In a similar case, an eighteen-year-old unmarried natural mother signed a consent and surrendered her child to the adoptive parents. Within two or three weeks she decided it was a mistake and asked that her daughter be returned. The adoptive parents refused. The natural mother resisted the adoption and brought habeas corpus. In deciding in favor of the natural mother, the court stated,
"The hardships produced by a separation of the child and the petitioners at this time are in substantial measure the result of the petitioners' resistance to the natural mother's efforts to regain custody. Those hoping to become adoptive parents cannot create their best argument for keeping a child's custody by thwarting a natural parent's known wishes."
and continuing, the court stated,
"Where, as here, a natural mother not represented by legal counsel at the time consent is given attempts to withdraw that consent within a few weeks and thereafter takes reasonable steps available to regain the custody of her child, neither so-called `vested rights' nor superior economic or social position of the proposed adoptive parents will serve to deprive that withdrawal of legal effect." Small v. Andrews, 20 Or. App. 6, 530 P.2d 540 (1975).
See also Adoption of Vaida, 34 Or. App. 631, 579 P.2d 313 (1978), wherein it was stated,
"Knowing and voluntary consent by a child's parent or parents is the basis of the adoption process. The integrity of the private placement system requires that such consent be scrupulously obtained.
"The interests of the child are always a primary consideration, and it does not come easy to render a decision which appears to be inconsistent with his interests emotionally, economically, and environmentally. But we are not authorized to
"`* * * interfere with the natural relationship of parent and child upon the sole ground that the proposed adoptive parents are able to give the child superior advantages over those within the means or social status of the natural parents.'"
The adoptive parents also contend that TD's consent obtained before the birth of baby girl D was irrevocable and, therefore, they should be permitted to keep TD's baby. The contention finds little support in law. And even where the consent form is executed after the birth of a child, undue influence (over-persuasion) will result in an insufficient consent.
*1376 Thus, in In Re Alsdurf's Petition, 270 Minn. 236, 133 N.W.2d 479, 481 (1965) the court stated:
"[T]he natural mother has been the victim of misguided meddling and officious pressures on the part of persons who were bent on persuading her to part with the custody of her infant daughter.
* * * * * *
"From the moment Charlotte Sadler first consulted her doctor on February 5, 1962, she was subjected to pressures from every source. * * * Shortly after the birth of the child, a hospital employee, characterized by the court as a self-styled unofficial social worker, intruded herself, uninvited, into Miss Sadler's double room for the admitted purpose of assisting Mrs. Alsdurf, a fellow employee at the hospital, to secure the infant for adoption. She joined Mrs. Alsdurf on February 27 in discussing with Miss Sadler the relinquishment of custody at a time when Miss Sadler was weeping and obviously distraught. The same evening the Alsdurfs' attorney presented a consent for Miss Sadler's signature. During all of this period, when the doctor, the welfare department, the hospital official, the adoptive mother, and her lawyer were wittingly or unwittingly bringing pressure to bear on Miss Sadler, she received no disinterested counsel designed to protect her against an ill-advised and impulsive decision at a time of physical and emotional distress."
A physician, on ten visits over a three and one-half month period, urged a mother to dispose of her baby and referred her to a social worker who advised that it was the right thing to do. Her consent was obtained within 24 hours after a difficult birth involving cesarean section. One week after release from the hospital she contacted the doctor and began seeking return of her child. The Utah Supreme Court held the consent void. D____ P____ v. Social Service & Child Welfare Department, 19 Utah 2d 311, 431 P.2d 547 (1967). See also additional cases listed in 50 A.L.R.3d 929 (1972).
The cases cited are just a few of the multitude of cases in which a natural parent seeks to regain her child. The attachment of a mother who gives birth to a child is a natural phenomenon resulting in part from pregnancy, carrying the child nine months to term and the trauma and pain of childbirth. Thus we have said,
"[T]he earliest and most hallowed of the ties that bind humanity, in all countries considered sacred, is the relationship of parent and child. Therefore, parents have the first and natural right to their children. A decree of adoption tears asunder forever the parent-child relationship and for all legal and practical purposes, that child is the same as dead to the parent affected. The parent has lost the right to ever again see the child or even know of his whereabouts. Courts cautiously guard the parent-child relationship." Matter of Adoption of Voss, Wyo., 550 P.2d 481, 485 (1976).
At the time this matter arose, § 1-22-109, W.S. 1977 was in effect and provided:
"(a) A written relinquishment of the child and written consent to adoption shall be filed with the petition to adopt * * *
* * * * * *
"(c) The consent may be signed at any time * * *
"(d) Consent to adoption and the relinquishment * * * are irrevocable." (Emphasis added.)
Subsequently, legislation was enacted as ch. 118, 1986 S.L. of Wyoming, § 1-22-109(e), which provides:
"(e) The consent to adoption and the relinquishment of a child for adoption may be contained in a single instrument. A separate post-birth written or physical relinquishment is not required."
Though ch. 118, 1986 S.L. of Wyoming cannot retroactively affect this case, it needs discussion. The statute was hastily written, poorly conceived, and stands alone among the statutes of the 50 states. It offers little protection to the rights of a mother who gives birth to her child. It *1377 was adopted during an emotional period, in a short legislative budget session. Little consideration was given to its long-term effect upon future cases.
Sections 1-22-109(c), (d) and (e) provide that a consent and relinquishment may be signed "at any time," that such consent and relinquishment is irrevocable, and a separate post-birth written or physical relinquishment is not required. Does "at any time" mean during the first month of pregnancy, or any month, or even before conception? Can the baby now be relinquished before it is born? Having signed the consent and relinquishment, is the pregnant woman obligated to carry the baby to term, deliver the child, and hand it over? Suppose the unmarried pregnant woman marries the father before the birth of her child. According to the statute, she must give up her child for her previous consent is irrevocable. Suppose that she signs the consent when she is overwhelmed by the pregnancy, ill, distraught, confused, uncertain as to what to do, but resolves all of her concerns before birth. Can she change her mind and keep her child? Not according to the recently enacted legislation, for her consent is irrevocable and she is forever barred from having her own child. Her doctor can take the baby from the hospital, as in this case, and deliver it to strangers.
Appropriate legislation should give due consideration to the rights of both the natural and the adoptive parents. It ought to clearly spell out those rights and be fair to all.
An examination of statutes of other states relating to consent, relinquishment, its validity and the right of withdrawal are helpful. Statutes from the following states illustrating various methods of treating with these questions are as follows:
CONSENT INVALID UNLESS EXECUTED AFTER BIRTH
Nevada Revised Statutes § 127.070;
"1. All releases for and consents to adoption executed by the mother before the birth of a child are invalid."
Florida Statutes Annot. § 63.082;
"(4) The consent shall be executed only after the birth of the child, in the presence of two witnesses, and be acknowledged before a notary public."
Arkansas Statutes Annot. § 56-208;
"(a) The required consent to adoption shall be executed at any time after the birth of the child and in the manner following."
Alaska Statutes § 25.23.060;
"(a) The required consent to adoption shall be executed at any time after the birth of the child in the presence of the court or in the presence of a person authorized to take acknowledgments.
CONSENT INVALID UNLESS SPECIFIED TIME AFTER BIRTH
Arizona Revised Statutes § 8-107;
"B. A consent given before seventy-two hours after the birth of the child is invalid." (Emphasis added.)
Revised Code of Washington Annot. § 26.33.160;
"(4) The written consent to adoption shall be signed under penalty of perjury and shall state that:
"(a) It is given subject to approval of the court;
"(b) It has no force or effect until approved by the court;
"(c) The consent will not be presented to the court until forty-eight hours after it is signed or forty-eight hours after the birth of the child, whichever occurs later."
Code of Virginia § 63.1-225;
"The consent of a parent for the adoption of his or her child shall not be valid unless the child be at least ten days old at the time the consent is signed."
CONSENT SIGNED BEFORE JUDGE
Michigan Statutes, Annot. § 27.3178(555.44); M.C.L.A. § 710.44;
"(1) Except as otherwise provided in this section, the consent required by section 43 shall be by a separate instrument executed before the judge of probate having jurisdiction or, at the court's direction, before another judge of probate in this state."

*1378 Tennessee Code Annot. § 36-1-114;
"(a) All surrenders must be made before a judge in chambers of chancery or circuit court except as hereinafter provided."
See also 10 O.S. 1981 § 60.5, Oklahoma Statutes.
CONSENT MAY BE WITHDRAWN
Iowa Code Annot. § 600.7;
"3. A consent to the adoption may be withdrawn prior to the issuance of an adoption decree under section 600.13 by the filing of an affidavit of consent withdrawal with the court."
See also 74 A.L.R.3rd 435, 436 for list of states allowing absolute right of withdrawal, and 2 Am.Jur.2d Adoption § 46.
Consideration should be given to legislation of other states with a view to providing definiteness as to the rights of the parties for the protection of both the natural and adoptive parents. If no action is taken it seems clear that we can expect more controversy and more litigation of this kind.
One last comment. It has been suggested that we ignore the law and award custody to the adoptive parents because they have had possession of baby girl D for approximately three years. If that premise is valid, then we should award custody to a parent who kidnaps children and hides them for three years while bonding occurs. That would be contrary to law. We are not free to do as suggested, but must apply the law as we find it. TD's grandmother says TD still cries over this ordeal. This is a tragedy for both parties, and has been difficult for the Court. The result, however, is mandated by law and for the reasons stated I continue to concur.
URBIGKIT, Justice, dissenting, with whom THOMAS, Chief Justice, joins.
"There will be a moaning in your heart,
There will be an anguish in your eyes;
You will see your dearest ones depart,
You will hear their quivering good-byes.
Yours will be the heart-ache and the smart,
Tears that scald and lonely sacrifice;
There will be a moaning in your heart,
There will be an anguish in your eyes.
"There will come a glory in your eyes,
There will come a peace within your heart;
Sitting `neath the quiet evening skies,
Time will dry the tear and dull the smart.
You will know that you have played your part;
Yours shall be the love that never dies."[1]
With extraordinary specificity, the cold glaze of history will also perceptively judge each participant once or hereafter involved with this child, BGD, in her future, now redirected and certainly conjectural.
Having become also only lately involved, I would dissent from the present disposition of BGD by the court in affirming the prior opinion and decision, Matter of Adoption of BGD, Wyo., 713 P.2d 1191 (1986).
The custody/adoption conflict was tried in the district court on the theory of duress and undue persuasion to which adverse findings of fact were made by the trial court on the contested issues.
On appeal, differing from the contested trial-court issues, this court in the earlier opinion based the decision on statutory interpretation in order to invalidate the executed consent and relinquishment document:
"I, [TD], having been first duly sworn according to law, and having been fully advised of my rights in this matter and of the effect of signing this consent to adoption, upon my oath do hereby certify and declare:
"That I am the natural mother of a child, that I am not married and that the child will be born to me out of wedlock. "That I do hereby voluntarily and freely give my full and free consent to the adoption of my child by [LDP] and [MFP], it being understood by me that in giving such consent that I am relinquishing *1379 all of my rights of whatsoever nature in and to said child and that said child can never be claimed by me and that this consent is irrevocable.
"That believing it to be for the best interest of the said child, I do hereby voluntarily relinquish and release forever all right, claim, interest and control which I may have in and to said child; and that I do hereby voluntarily relinquish and release unto the above-named adopting parents the lawful physical custody and control of my said child so that they may have and keep the child in their home and treat said child as their own; and that I agree that by the entry of a decree of adoption by the court that the said child shall, to all legal intents and purposes, become the child and heir at law of the above-named adopting parents and cease to be my child. I also hereby give my full and free consent that the said child shall take the family name of the above-named adopting parents.
"That I do hereby expressly waive any and all notice of the time and place, as may be required by law, in connection with any adoption proceedings brought in any court of competent jurisdiction in regard to the adoption of said child, and I do hereby consent that any such adoption matter may be heard at any time in the discretion of the court without further notice to me and without my presence, even though I may be entitled to such notice and to be present at any hearings.
"DATED this 15th day of March, 1983.
 "/s/ [TD] 
 "[TD]
"[Acknowledgment.]"
Now the decision will be reaffirmed upon a restatement of an obviously unintended statutory conception which has been subsequently rejected by the legislature and with a reconceptualization of the facts to reverse the factual finding of the trial court. Sadly, the best interest of the child gains no decisional significance in this conclusion. See recent decisions of this court, Matter of Adoption of GSD, Wyo., 716 P.2d 984 (1986); and Matter of Parental Rights to ARW, Wyo., 716 P.2d 353 (1986).
Post-rehearing dissents occasion little contributory opportunity to advance the course of jurisprudence, and probably no benefit to the object of the litigative processes. However, concern about the child, and obligation to the law to be applied in future cases mandates comment.
The Wyoming legislature has now efficiently and directly restated by even more determined language what was earlier intended so that any present evaluation of legislative intention as embodied in the prior law appears confined only to BGD:
"AN ACT to amend W.S. * * * 1-22-109 by creating a new subsection (e) relating to adoption * * *.
* * * * * *
"1-22-109. Consent to adoption.
"(e) The consent to adoption and the relinquishment of a child for adoption may be contained in a single instrument. A separate post-birth written or physical relinquishment is not required." Ch. 118, S.L. of Wyoming 1986, effective June 11, 1986.
More critically evidenced in this custody resolution is the reappearance of the long-discarded philosophy that children are parental chattels to be baggaged and handled as possessions, not persons. More recently, the constitutional attributes of parental rights have been reordered to be less significant than the separate constitutional interest, health and development of the child. In re Adoption of Hiatt, 69 Wyo. 373, 242 P.2d 214 (1952).

Statutory Construction
In his prior dissent in this appeal, Matter of Adoption of BGD, supra, 713 P.2d at 1193, Chief Justice Thomas carefully followed the course of statutory changes in defining the requirements for consent and relinquishment documents to support adoption.
The 1977 legislature, as derived from earlier Judiciary Committee interim session consideration, came to consider the Wyoming *1380 law by introduction of a new adoption statute as House Bill 144, co-sponsored by the committee chairman, Ross Copenhaver, and other committee members.
The singular change from the prior provisions afforded by Ch. 59, § 7, 1963 S.L. of Wyoming (§ 1-710.1, W.S. 1957, 1975 Cum. Supp.) was the inclusion of the very specific clause in subsection (c) of § 1-22-109, W.S. 1977, providing, "The consent may be signed at any time." (Emphasis added.) This provision, as a categorical language addition, should reasonably reflect a legislative intent to extinguish and bury the prior question of the validity of the consent and relinquishment form which is signed either pre- or post-partum. Likewise added in the 1977 act, as noted by Chief Justice Thomas, was the provision specifically validating the minor's consent to afford finality of the form after execution. See thoughtful comments in the partially concurring and dissenting opinion of Chief Justice Guthrie on legislative interpretation, in Matter of Adoption of Voss, Wyo., 550 P.2d 481, 487 (1976).
The consent and relinquishment forms in this case, one signed by the mother, and another signed separately by the putative father, affords no question or confusion of intent or purpose.
If ever a recognition of legislative intent was more specifically to be asserted, it would be recognized in this case where the ink was hardly dry on the original decision of this court before the legislature had immediately amended the statute to assure that the construction advanced by this court would no longer be sustainable.
"`Since the legislature has enacted statutes prescribing how adoptions shall be accomplished, this court has no power to change in any particular the law as expressed in those statutes... . The role of this court is limited to construing the adoption statutes and attempting to ascertain the meaning of the legislature as expressed therein.'" S.O. v. W.S., Alaska, 643 P.2d 997, 1005 (1982), quoting from Strobel v. Garrison, 255 Or. 16, 464 P.2d 688-690 (1970).
"* * * Here, however, we have a statute which, from our decision, cannot by definition be contrary to public policy  it is public policy." In re Adoption of MM, Wyo., 652 P.2d 974, 978 (1982).
Cf. Matter of Adoption of Voss, supra.

Invalidity of the Trial Court's Findings
The second singular issue in this case for the court to justify its decision is the attack on the finding of the trial court denying duress and undue persuasion.[2]
*1381 Standard rules in support of the trial court and their special findings of fact are so well established as to afford little additional knowledge to the bench and bar by further recitation. Sowerwine v. Nielson, Wyo., 671 P.2d 295 (1983); Whitefoot v. Hanover Ins. Co., Wyo., 561 P.2d 717 (1977); United States v. National Association of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950).
It could be considered that the United States Supreme Court, in rather succinct and specific fashion, addressed the appellate rules which should apply, in Icicle Seafoods, Inc. v. Worthington, ___ U.S. ___, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). Justice Rehnquist reordered and defined in proper perspective, in reversing the circuit court's earlier reversal of the district court determination of fact, in the following sequence:
1. A factual question as a specific finding could be set aside only if "clearly erroneous."[3]
2. If the appellate court believes that the trial court failed to make findings of fact essential to the proper resolution of the legal question, it should have remanded to the district court to make those findings.
3. If it was of the view that the findings were "clearly erroneous," within the meaning of Rule 52(a), it could have set them aside on that basis.
4. If the findings were unassailable, but the proper rule of law was misapplied to the findings, it could have reversed the district court judgment.
5. But it should not simply have made factual findings on its own. See Icicle Seafoods, Inc. v. Worthington, supra.
At this juncture, in this case, the finite fallacy of legal resolution directly addressed by Justice Rehnquist is evidenced in this second appeal consideration where neither in trial consideration nor first appeal was that adverse factual complicity determined.
Suffice it to be said that any present "findings" of this court of duress or undue persuasion are simply unjustified by this court's appellate practice, and implicate only by justification as a result-oriented, factually redetermined appellate disposition which the majority of this court has determined by opinion conclusion.
Consequently, any detailed discussion at this time of the record reflecting the course of events in the consent, withdrawal and adoption process by dissent of this writer by further re-evaluation, can now only afford litigant frustration.

Best-Interest Criteria
The rationale used by the court in construction of the statute and disagreement with the trial court on factual findings, is, however, for the delivery of BGD to the *1382 mother by removal from the adopting parents, the reason I write this dissent. See thoughtful comments of Judge Ilsley in In re Adoption of Hiatt, supra; Matter of Adoption of D.P., Wyo., 583 P.2d 706 (1978).
The decision of this court places the "predilection to sustain the natural family" before the best interest of the child. Matter of Adoption of BGD, supra, 713 P.2d at 1193. This explains the conclusion that a written post-birth relinquishment is required by our statute, as it prevents "a natural parent * * * from giving consent to adoption without counsel and careful deliberation." Id. at 1193. Construing the adoption statutes based on this "predilection" was, in my opinion, error.
"* * * [T]he paramount question at all times, when the custody and control of a minor child is in dispute, is the welfare of such child." Kennison v. Chokie, 55 Wyo. 521, 100 P.2d 97, (1940); Morris v. Jackson, 66 Wyo. 369, 212 P.2d 78 (1949). This approach may, however, conflict with the rule of strictly construing adoption statutes in favor of the natural parent's claim. Matter of Adoption of Voss, supra (which case was in obvious conflict with earlier Wyoming cases). Other courts have recognized these conflicting goals in construing consent provisions and concluded that since the paramount purpose of the adoption laws is to make provision for the welfare of children, the better rule is to construe adoption statutes in a manner which will promote this purpose. S.O. v. W.S., supra, 643 P.2d at 1002 n. 7;[4]In re Adoption of Barnett, 54 Cal.2d 370, 6 Cal. Rptr. 562, 354 P.2d 18, 22-23 (1960).
The court here, in the first opinion, in construing the statute for child-custody disposition, failed to fully consider the best interest of the child.
"`* * * [T]he best interests standard involves a careful weighing of the myriad factors, such as the character and maturity of the parents, their commitment to the care of the child, the child's present bonds of affection, the family setting and stability, and so forth, which together form the foundation for a stable and happy home for the child.'" S.O. v. M.S., 643 P.2d at 1006, quoting In re Anderson, 99 Idaho 805, 589 P.2d 957, 974 (1978), Bakes, J., dissenting.
Commentators often recognize that permanent placement decisions should be made as soon as possible in order to prevent the trauma of separating the child from the adult with whom the dependency and affection relationship exists. See Note, In the Child's Best Interests: Rights of the Natural Parents in Child Placement Proceedings, 51 N.Y.U.L.Rev. 446, 451 (1976); and Note, Alternatives to Parental Right in Child Custody Disputes Involving Third Parties, 73 Yale L.J. 151, 161 (1963).
In this case, only passing reference was made to the child's best interest, even though the court professed that "the policy of this Court, in adoption cases, is to look at what is best for the child under all circumstances." Matter of Adoption of BGD, supra, 713 P.2d at 1193. No mention of factors important to consideration of best interest is made, other than to note the three-year "association" between the child and her adoptive parents. Thus, the only factor considered is labeled an "association," and quietly discarded. I believe raising a child from newborn to the third year of life constitutes more than an "association," and I would place appropriate emphasis *1383 on the relationship existing between the child and the adoptive parents.
"* * * [F]or the child, the physical realities of his conception and birth are not the direct cause of his emotional attachment. This attachment results from day-to-day attention to his needs for physical care, nourishment, comfort, affection, and stimulation. * * *
* * * * * *
"Where there are changes of parental figure * * * the child's vulnerability and the fragility of the relationship becomes evident. The child regresses along the whole line of his affections, skills, achievements and social adaptation." Goldstein, Freud & Solnit, Beyond the Best Interests of the Child, 17-18 (1979).
In addition to the thoughtful review and evaluation in the most current case of S.O. v. W.S., supra, an exhaustive analysis, Note, Family Law: Natural Parent Preference or the Child's Best Interests: The Court's Dilemma in S.O. v. W.S. (Alaska 1982), 12 UCLA-Alaska L.Rev. 141 (1982-83), is of singular interest. Alaskan law had a differing feature in that a provision for a withdrawal of the consent and relinquishment was provided.
"[That law] does recognize the special status of the biological parent by providing the absolute right to withdraw the consent within ten days. However, beyond that time period, the `statute ceases to accord the natural parents a right superior to that of the adoptive parents and instead mandates that the withdrawal be permitted only if such is in the best interest of the child being adopted.'
"A minority of jurisdictions have applied the parental preference in cases involving a biological parent's withdrawal of consent." 12 UCLA-Alaska L.Rev. at 147, citing Annot., 74 A.L.R.3d 424.
In further reviewing the general law and the Alaska case, the case-note author detailed:
"The focus in these minority jurisdictions, despite any language to the contrary, rests on the rights of the parents rather than on the welfare of the child. Undoubtedly the parents' rights should be respected. But a young child's emotional and physical welfare hangs in the balance, and courts ignore a large body of relevant evidence by restricting their inquiry to the question of parental fitness. * * *.
* * * * * *
"The Alaska Supreme Court correctly rejected the parent-centered focus of the minority jurisdictions * * * [and] the result it reached is strongly supported by legal commentators, judicial decisions in related kinds of child placement cases, and in the research and clinical experience of child development specialists. The dominant theme interwoven throughout the work of these diverse professionals is that a child's physical, mental and emotional development depend largely upon the creation and maintenance, early in life, of strong, stable relationships with an adult who consistently provides attention, stimulation and affection, in addition to the fulfillment of basic physical needs.
"In their highly-regarded book concerning children cast into the legal world of child placement, Goldstein, Freud and Solnit [in Beyond the Best Interests of the Child (1973)] * * * refer to these adults as `psychological parents.' Psychological parents may be, and ordinarily are, the biological parents. But biology is not determinative. The mere physical tie between a woman and the child she bears does not form the foundation of a strong attachment bond, at least from the child's perspective. Rather, strong bonds form after continuous periods of positive stimulation and interaction. Many child development specialists agree with the Goldstein approach. When talking of `parent-child separation,' child development professionals typically mean the psychological parent rather than the biological parent.
"Once a child has developed strong attachment bonds with the psychological parent, a separation can be both physically and psychologically traumatic, even *1384 for infants and toddlers. Studies conducted by Anna Freud and her colleagues indicate that disruption in the continuity of care may cause physical discomfort, chronic crying, digestive problems, sleeping problems, and delays in the infant's orientation and adaption to his or her surroundings. On a long-term basis, such discontinuity of affection and care may cause the child to form shallow and indiscriminate attachments.
* * * * * *
"Testimony regarding considerations such as separation trauma and continuity needs in children of a particular age will be useful, as will expert testimony addressing the psychological make-up of the child in question. Other important factors which might be introduced during the hearing include (1) the quality and length of the emotional attachments; (2) the amount of time the child has lived with the prospective adoptive parents; (3) the amount of time the child lived with, and has been separated from, the natural parent; (4) evidence of the character, moral fitness, and maturity of the parents and prospective adoptive parents; (5) the commitment to the care and development of the child; (6) the home environment and family setting, and its stability; (7) the age, sex and health of the child; and (8) the desirability of continuing the existing child-third party relationship. Finally, and certainly not to be overlooked if the child is of a reasonable age, the wishes of the child should be respectfully considered." 12 UCLA-Alaska L.Rev. at 149-153.
Directly stated, I would contend that the best interest of BGD, a girl now slightly more than three years old, has simply disappeared as a responsive test in the adjudicatory demarche. It was improper to invalidate the consent to void the adoption, but surely more unjustified to commit the child to the natural mother with whom no post-birth association has existed, for an improbable future, without otherwise determining present concerns for the best interest of this young child.
NOTES
[*] Justice Brown filed a concurring opinion in which Justice Raper, retired, joins.
[**] Justice Cardine filed a concurring opinion in which Justice Brown and Justice Raper, retired, join.
[***] Justice Urbigkit filed a dissenting opinion in which Chief Justice Thomas joins.
[1] Robert Service, The Mother.
[2] The court finds that plaintiff, [TD], is now of the age of seventeen years and is the natural mother of the minor child, who is the subject of this action, said minor child being born to plaintiff on March 22, 1983 in Newcastle, Wyoming. * * * The plaintiff whose legal name is [TR] became pregnant when she was fifteen years of age and resided in Lusk, Wyoming with her mother and step-father, [ZD] and [JD].
* * * * * *
"6. * * * That defendants [appellants herein] have paid the doctor and medical costs incurred in the birth of the minor child.
"7. * * * [T]he court in the said interlocutory decree found that the natural mother had freely and voluntarily given her full and free consent to the adoption of her minor child.
"8. That although the parents of the natural mother, [TD], testified that after the signing of the consent by [TD] and prior to the birth of the child they and [T] may have had some second thoughts about the adoption they nontheless placed [T] under the care of Dr. Reimer for the delivery of the child. At the time, of the birth of the child, [T] and her parents were living in Lusk which is 86 miles from Newcastle. They traveled to Newcastle for the birth of the baby under the care of Dr. Reimer. Had they truly had some question about the adoption they could have very easily taken [T] from the care of Dr. Reimer and had the baby delivered at some other place. It would be reasonable to conclude that if persons had really changed their mind about the adoption they would have severed all relations with people who were interested in the adoption including the doctor.
"9. The court observed [TD] on the witness stand and came to the inescapable conclusion that she was very immature and had little touch with reality.
"10. She had seven days after signing the consent to reconsider her actions and to take whatever steps were necessary to revoke, or rescind the consent to adoption. She did nothing to change the matter which she put in motion by signing the consent. If there were any infirmities in the consent she has waived them by failing to take appropriate timely action. She cannot be heard to complain at this late date. She could have refused to sign the consent when it was presented to her and consulted with an attorney before she signed it. After she signed the consent she consulted with her step-father and if she then determined that she did not want to go through with the adoption she and her step-father could have prior to the birth of the child called the lawyer and advised him that the consent was withdrawn. Had that been done the court would have granted the plaintiff's prayer.
"11. Although there is a conflict in the evidence the court finds that neither [TD] or her parents communicated that [T] wished to withdraw her consent to the adoption until after 10:00 a.m. on the morning after the baby was born and at that time the defendants had the baby in custody and the petition for adoption had been filed in the District Court."
[3] Rule 52(a), W.R.C.P., does not contain the "clearly erroneous" criterion of Federal Rule 52(a). However, no difference in result is perceived, since this court has by continued decisions adopted the "clearly erroneous" test for special findings of fact. Shores v. Lindsey, Wyo., 591 P.2d 895, 899 (1979):

"Clearly erroneous or against the great weight of the evidence * * *. [It will be set aside] if the reviewing court on the entire evidence is left with a definite and firm conviction that a finding is mistaken."
Mountain Fuel Supply Co. v. Central Engineering & Equipment Co., Wyo., 611 P.2d 863 (1980); Rutar Farms & Livestock, Inc. v. Fuss, Wyo., 651 P.2d 1129, 1133 (1982).
[4] S.O. v. W.S., supra, contains a number of similarities to the present case, including a claim by the natural mother that there was an invalid "consent" since the consent appeared on a document entitled "Relinquishment of Parental Rights." The Supreme Court of Alaska had no trouble in finding that the statements within the document as well as the circumstances leading to its execution meant that it satisfied the requirements of a valid consent. Likewise, I find a consent stating: "I am relinquishing all of my rights of whatsoever nature in and to said child," to be a valid relinquishment. I also note that greater emphasis is placed on the child's best interest, as compared to the natural parent's rights, in a case in which the validity of a consent to adoption is at issue.