In the Matter of Adoption of Timothy Patrick Vaida, a
Minor, by
CURRAN et ux, *Appellants,*
*v.*
VAIDA, *Respondent.*
(No. A 77-7-8, CA 9578)

579 P2d 313

W. Bradford Jonasson, Jr., Oregon City, argued the
cause for appellants. With him on the brief was Santos
and Schneider, Oregon City.

Richard C. Goss, Oregon City, argued the cause for
respondent. With him on the brief was Oregon Legal
Services, Oregon City.

Before Schwab, Chief Judge, and Lee, Richardson
and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Petitioners appeal an order of the circuit court denying their petition for adoption of a child born October 22, 1975, to respondent, who was then unmarried. The sole issue is whether the trial court erred in permitting respondent to revoke her written consent to adoption.

Respondent was sixteen years old and living with her mother when the child was born. She had attended school through the tenth grade, receiving low marks. When the child was three months old, respondent took him to the natural father. She discovered that the father had recently fathered another baby out of wedlock by a second woman and would not take responsibility for her and their child. Shortly thereafter she left the child with her mother and went to California. She later returned for the child, and they lived in California for several months.

In the latter part of 1976, respondent and the child returned to Oregon. They lived with her mother again for a short time, but after a quarrel they moved into the home of another woman, where they remained for approximately a month. The child had been ill frequently during his first year, and respondent had begun to feel that she was not giving him proper care. There was no evidence that the child was abused or neglected. Respondent discussed with several persons the possibility of giving the child up for adoption or placing him in a foster home until she was better able to care for him.

One of the persons with whom respondent discussed the child was petitioner Michael Curran, who was a frequent visitor in the home where she was living. Soon after they met, he and respondent began having sexual relations. He was 26 years old at the time, respondent 17. He took an interest in the child and suggested that respondent give the child to him. He was engaged to be married to another woman approximately the same age as respondent. He informed

[ 633 ]

respondent that he was unable to have children of his own, and said that he would give the child a good home. Respondent at that time rejected the idea.

In late January, 1977, respondent turned eighteen, went on welfare and moved into her own apartment. In late February, all her money was stolen and she was faced with eviction. She took a job with a traveling carnival intending to live in a van with a man who also worked for the carnival. She was concerned about her ability to care for the child under those conditions. On February 20, the day before she moved from her apartment, respondent took him to petitioners' apartment. Later that day she delivered to petitioners all of his clothing, toys and baby pictures. She said that she did not want anything to remind her of him.

Mr. Curran contacted an attorney, and on March 3, 1977, he and respondent went to the attorney's office. On the way there, respondent testified, Curran told her that he wanted her to sign a document which would give him authority to consent to medical care for the child. Respondent was not represented at the meeting. She was given a document to read which, in addition to authorizing petitioner Michael Curran to consent to medical treatment, stated in material part:

"I do hereby specifically, voluntarily and irrevocably relinquish and release said minor child for adoption to [petitioners] when they have become husband and wife, and this consent to adoption may be filed with their petition for adoption after their marriage.

"* * * * *

"I hereby freely, voluntarily, and irrevocably give up any and all rights to said minor child by virtue of having given him birth and his natural mother [sic] * * *".

Respondent asked the meaning of several words which she did not understand. The attorney read the document to her and explained several terms. The attorney also had respondent speak on the telephone to a Children's Services Division adoption investigator. The investigator did not, however, review the document with her; she referred to the document, in

general, as "leading to adoption." Respondent then signed it.

Respondent testified that she did not understand the document. She said it was her understanding that she was giving petitioner authority to consent to medical treatment and that the adoption process would take six months, during which time she could change her mind and get the child back if she "[got] her head on straight."

Shortly after the signing of the consent form, the man with whom respondent was living was arrested, and she left for California. She was there reunited with the man to whom she is now married, whom she had met several years before. She discussed the child with him and showed him the document she had signed. He explained its significance to her. She said she had changed her mind and wanted the child back. She immediately wrote a letter to Curran, accusing him of tricking her. In May, 1977, respondent attempted unsuccessfully to get an appointment with a legal aid office in California. She also sought the assistance of private counsel but found that was too expensive. She bought a bus ticket to return to Oregon, but was hospitalized and did not make the trip. In July, she finally succeeded in getting a private attorney. On July 21, her attorney notified petitioners' attorney that respondent no longer wanted to go forward with the adoption.

On September 9, 1977, the circuit court held a hearing on the petition for adoption and objections thereto. In addition to the foregoing testimony, there was evidence that in order to expedite the adoption, petitioners had married in April, rather than in May as they had planned. Mrs. Curran had quit her job and they had moved into a more suitable apartment. The child was well integrated into petitioners' family, and his health had improved.

The trial court expressed the conclusion that it would be in the child's best interests to remain with

petitioners. However, the court also concluded that respondent had not sufficiently understood the document she had signed in petitioners' attorney's office and ruled that she should be permitted to revoke her consent to adoption. The child was left in the custody of petitioners pending appeal.

Without the consent of the natural parent or parents a court as a general rule has no jurisdiction to enter an adoption decree. ORS 109.312. It is established that

"* * * [a] natural parent who has consented to adoption may revoke consent at any time before the court has issued a decree of adoption unless circumstances indicate that the parent should be estopped to revoke the consent." *H. and H. v. O. and W.,* 28 Or App 887, 889, 561 P2d 1038 (1977).

In determining whether the natural parent should be "estopped" from revoking consent, numerous factors which reflect the interests of the child, the adoptive parents and the natural parents must be considered. They include the following:

"* * * [T]he circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties, between the giving of consent and the attempted withdrawal; whether or not the withdrawal of consent was made before or after the institution of adoption proceedings; the nature of the natural parent's conduct with respect to the child both before and after consenting to its adoption; and the 'vested rights' of the proposed adoptive parents with respect to the child * * * the relative abilities of the adoptive parents and of the natural parents to rear the child in the manner best suited to its normal development, and other circumstances indicative of what the best interests of the child require." *Williams et ux v. Capparelli,* 180 Or 41, 45-46, 175 P2d 153 (1946). (Citations omitted.)

Giving due regard to all the factors, still the most significant consideration in this case is the circumstances under which the consent was given. The respondent was in the midst of a personal crisis. She was without the benefit of representation or effective

guidance. She was in a position to be greatly influenced by Mr. Curran, who was aware of her confusion. The trial court, which had an opportunity to see and hear the witnesses, found that respondent had not understood the consent document. As soon as she was informed of its true significance, she began to take steps to have it set aside.

The interests of the child are always a primary consideration, and it does not come easy to render a decision which appears to be inconsistent with his interests emotionally, economically and environmentally. But we are not authorized to

> "* * * interfere with the natural relationship of parent and child upon the sole ground that the proposed adoptive parents are able to give the child superior advantages over those within the means or social status of the natural parents." *Williams et ux v. Capparelli, supra,* 180 Or at 46.

Knowing and voluntary consent by a child's parent or parents is the basis of the adoption process. The integrity of the private placement system requires that such consent be scrupulously obtained. Where circumstances have indicated that consent was not given freely and knowingly, we have allowed the natural parent to disavow it, even though it was clearly in the best interests of the child to remain with the adoptive parents. *Small v. Andrews,* 20 Or App 6, 530 P2d 540 (1975).

Considering the circumstances under which consent was obtained in this case, the trial court properly denied the petition for adoption.[1]

Affirmed.

---

[1] A trial court is not without recourse in a situation such as this when forced to permit a revocation of consent in the face of circumstances indicating the child's best interests are not being well served. Under ORS 109.307 the court may continue the legal custodial status of the child, remand the child to juvenile court or take any other necessary action to protect the child. A juvenile court will have jurisdiction by reason of ORS 419.476(1) (c) or (e) and may terminate parental rights under ORS 419.523.