Argued and submitted October 4, 1993, affirmed March 2, petition for review allowed
July 26, 1994 (319 Or 406)

In the Matter of
the Adoption and Change of Name of
Yasha Raynae Weathersby, a Minor.

Carl STUBBS
and Yvonne Stubbs,
*Respondents,*

*v.*

Thomaszine WEATHERSBY,
*Appellant.*

(58-90-00971; CA A78470)

869 P2d 893

Cristina Sanz argued the cause for appellant. With her on the brief was Maureen H. McKnight.

Greg Allen Hunt argued the cause and filed the brief for respondents.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

EDMONDS, J.

Landau, J., dissenting.

## EDMONDS, J.

The trial court initially granted petitioners' (the Stubbses) petition for adoption in April, 1991. Mother appealed, and we reversed and remanded for the trial court to determine whether it had jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA) and whether Oregon was an appropriate forum. 113 Or App 501, 833 P2d 1297 (1992). On remand, the trial court determined that it had jurisdiction and that it was appropriate to exercise its jurisdiction, and it "confirmed" the prior judgment that granted the adoption. Mother appeals, and makes multiple assignments of error. We affirm.

On *de novo* review, ORS 19.125(3), we find the following. Mother moved from Texas to Washington when she was five months pregnant. After the child was born on March 14, 1989, in Washington, she and the child lived in a crisis pregnancy shelter. When the child was less than a month old, mother met in Washington with the Stubbses, who lived in Oregon, to discuss the possibility of the Stubbses caring for the child. Because the Stubbses were only interested in adopting the child, no agreement resulted, and mother kept physical custody of the child. On April 17, 1989, faced with the prospect of living on the streets, mother placed the child in foster care with Catholic Community Services in Washington. In June, 1989, mother found an apartment and sought to regain physical custody. The agency refused to relinquish custody and filed a juvenile court dependency proceeding in King County, Washington. The dependency petition alleged that the child was voluntarily placed in foster care on April 17, 1989, that mother has had no contact with the child since that time, that mother failed to secure stable housing, to get a secure job, to participate in counseling or to have regular contact with the agency, and that, on May 26, 1989, mother stated that she did not wish to have any contact with the child. On July 25, 1989, King County Superior Court, Juvenile Division, appointed a guardian ad litem to represent the child, and on October 17, 1989, the court issued an "Order of Dependency By Default." That order provided that the child would remain in foster care, because "[t]here is no parent or guardian available to care for such child." Thereafter, the child continued to be in foster care.

Mother was forced to move out of her apartment in October, 1989. While the child was still in foster care, mother informed Dr. Phillips, who is affiliated with a Portland adoption agency, that "she was ready to relinquish the child, and that she wanted the child adopted." Phillips arranged for the Stubbses to go to Washington to pick up the child. On November 1, 1989, Yvonne Stubbs and a friend met mother at her apartment, picked up the child from the agency and returned to mother's apartment. While there, Yvonne repeatedly asked mother if "this was really what she wanted to do." Each time mother responded that she was sure. On the advice of Phillips, Yvonne asked mother to write something on paper that evidenced her intentions. Mother typed and signed a letter that said:

> "[The child] has been placed in the care of Yvonne Stubbs and Carl Stubbs, by Thomaszine Weathersby her mother.
>
> "They will be caring for her during this adoptive process, after which they will become her legal parents."

Yvonne told mother that their attorney would be sending her adoption papers to sign, and arrangements were made for mother to mail the child's birth certificate to the Stubbses to begin the proceeding.

On the same day, Yvonne returned to Oregon with the child. The child has remained in the physical custody of the Stubbses since that time. The juvenile proceeding in Washington was dismissed on November 8, 1989, on the ground that the "reason for removal of the child from the parental home no longer exists." On January 11, 1990, mother called Yvonne and told her that the father of the child might want the child back. The Stubbses filed a petition for adoption on January 30, 1990, which commenced this proceeding. In February, 1990, mother called Yvonne and said that she wanted her child back. On April 2, 1990, mother called Jeanne Etter of Open Adoption and Family Services in Portland, who was preparing a post-placement report for Children's Services Division, and told her that she wanted the child back. Also on that day, mother wrote a letter to the circuit court stating that she was revoking her consent and that she wanted her child returned to her.

Mother began to contact various agencies seeking assistance to get her child back. As a result, she was referred to Lane County Legal Aid Services, which began to represent her in May, 1990. Trial was held in this proceeding in April, 1991. The trial court ruled that mother had consented to the adoption and that she was estopped from revoking her consent. It granted the adoption, and mother appealed. In 1992, we remanded the case to the trial court. On remand, the trial court entered a judgment "confirming" the adoption. This appeal resulted.

■ First, mother argues that Oregon lacks subject matter jurisdiction under the UCCJA. The trial court found that it had jurisdiction pursuant to ORS 109.730(1)(b) and (d), and that Oregon is an appropriate forum. ORS 109.730(1)(b) provides that an Oregon court has jurisdiction to decide child custody matters if:

> "It is in the best interest of the child that a court of this state assume jurisdiction because the child and the parents of the child, or the child and at least one contestant,[1] have a *significant connection* with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.]" (Emphasis supplied.)

Under the statute, a significant connection with Oregon must have existed as of the date that the adoption proceeding was commenced. *State ex rel Torres v. Mason*, 315 Or 386, 393 n 6, 848 P2d 592 (1993). Therefore, we focus on the facts as they existed as of January 30, 1990, the date on which the petition was filed.

■ On that date, the child was approximately 11 months old. Although for eight months of her life she had lived in Washington, that state had dismissed the dependency proceeding initiated on her behalf. She had spent seven months of that time in foster care. In contrast, from November 1, 1989, through January 30, 1990, she had lived in Oregon with the Stubbses where she was cared for daily by the Stubbses, developed a bond with them, and adjusted to a new home environment. There is also substantial evidence as to her

---

[1] A "contestant" is defined as "a person, including a parent, who claims a right to custody or visitation rights with respect to a child." ORS 109.710(1).

present and future care, training, and personal relationships in Oregon, including evidence of medical care and contact with members of the Stubbses' church, that constitute a significant connection to this state. Also, it is undisputed that the Stubbses are residents of Oregon and have a significant connection with this state. On those facts, we hold that the circuit court properly assumed jurisdiction under ORS 109.730(1)(b).[2]

■ Next, mother argues that the trial court should have declined jurisdiction, because Oregon is an inconvenient forum. Under ORS 109.770, a court with jurisdiction may decline to exercise its jurisdiction if it finds that it is an inconvenient forum to make a custody determination and that another state is a more appropriate forum. ORS 109.770(3) provides:

"In determining if it is an inconvenient forum, the court shall consider if it is in the interest of the child that another state assume jurisdiction. For this purpose it *may* take into account the following factors, among others:

---

[2] We need not decide the correctness of the trial court's holding that it had jurisdiction under ORS 109.730(1)(d). The dissent would hold that Washington was the home state for the first eight months of the child's life and that Oregon does not have a significant connection to her to exercise jurisdiction. ORS 109.730(1) provides for concurrent jurisdiction even when another state is the home state. For instance, in *Henricks and Henricks*, 115 Or App 718, 839 P2d 766 (1992), Oregon had no "home state jurisdiction" because the children had resided in Virginia for more than six consecutive months before father filed his motion and the children were in Oregon for purposes of visitation. We held that the UCCJA contemplates concurrent jurisdiction:

"We said in *Stewart v. Stewart*, [83 Or App 675, 680, 732 P2d 951 (1987)]:

" 'Subsection (1)(b) requires that the child and at least one parent have significant connection with the state and that the court have "optimum access to relevant evidence" about the children and their family before acquiring jurisdiction; in this way the children's best interests are served. Commissioners' Note, 9 Uniform Laws Annotated 107, 108, § 3 (1973).' "

"An Oregon court granted the dissolution decree and awarded custody to mother. Father has lived and worked in Oregon for a substantial period. Mother resided in Oregon for approximately nine years until the marriage was dissolved in 1983. Both children were born and lived in Oregon until mother moved them to Virginia when the marriage was dissolved and have visited father in Oregon every summer since that time. Oregon is the only state where the parties and the children have lived together as a family. The children are now living and going to school in Oregon and can testify about their present personal relationships and care. Father can provide the court with information about their medical conditions, schooling, care and personal relationships. The court erred in rejecting 'significant connection' jurisdiction." 115 Or App at 722.

"(a) If another state is or recently was the child's home state;

"(b) If another state has a closer connection with the child and the family of the child or with the child and one or more of the contestants;

"(c) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;

"(d) If the parties have agreed on another forum which is no less appropriate; and

"(e) If the exercise of jurisdiction by a court of this state would contravene any of the purposes stated in ORS 109.720(1) and (2)." (Emphasis supplied.)

Mother points to the contacts that the State of Washington has, including her involvement with Catholic Community Services and with the child's foster care for eight months. Oregon's contacts are limited to a three-month period. On the other hand, mother contemplated that an Oregon court would assume jurisdiction over the child during the adoption process. Moreover, there is evidence available from Oregon witnesses, a psychologist and an adoption specialist, that comment on the best interests of the child based on the Stubbses' home environment. We have considered those factors as well as the other factors articulated in the statute and hold that Oregon is the most convenient forum. This ruling carries out the original intent of the parties, and it is the forum in which the most current information regarding the child's best interests exist.

■■ Next, mother argues that she did not consent to the adoption because her November 19, 1989, writing evidenced only a grant of temporary custody, and that the parties intended that the consent would be prepared later. If mother did not consent to the adoption, the judgment is void. *Small v. Andrews*, 20 Or App 6, 8, 530 P2d 540 (1975). In determining whether the writing constitutes a "consent," we look to the totality of the circumstances under which the writing was made. *See Curran v. Vaida*, 34 Or App 631, 636, 579 P2d 313 (1978). The Stubbses have the burden of proving by clear and convincing evidence that mother gave her consent to the adoption at that time. *See Andersen v. Crouse*, 83 Or App 216, 220 n 3, 730 P2d 1275 (1986).

■ Although we review *de novo*, we give weight to the trial court's findings, because it had the opportunity to observe the witnesses firsthand. It rejected mother's version of what occurred in the meeting between her and Yvonne. Instead, it accepted Yvonne's and her friend's testimony that the verbal consent on November 1, 1989, was

> "explicit, pointedly requested, and given numerous times. They also described the written consent to be a consent to adopt.
>
> "Birth mother's actions after November 1st, 1989, are totally inconsistent with her claim of conditional consent to an extended family and consistent with the child being delivered with the intent that adoption occur."

The trial court's findings are supported by the evidence. One month after giving birth, mother sought temporary help from others to care for her child. She met with the Stubbses in April, 1989, but declined their offer to adopt the child, because she was only interested in a temporary placement at that time. Over the next six months, she deliberated about the matter and discussed her situation with experienced professionals. Ultimately, she initiated the second contact with the Stubbses by telling Phillips that she wanted to relinquish the child for purposes of adoption. Although mother believed that she was consenting to what she called "an open adoption" in which she would have visitation rights, nonetheless, she intended to consent to an adoption rather than to a temporary placement. She made arrangements with Phillips to have the child delivered to the Stubbses. When they came to pick up the child, mother repeatedly assured Yvonne that she was sure of what she was doing. Although the letter mother wrote on November 1, 1989, does not use the word "consent," it does state that the Stubbses will care for the child during the "adoption process" and that the Stubbses "will become [the child's] legal parents." Mother was 29 years old and a college graduate at the time. She prepared the letter after repeatedly saying that she was sure that she wanted to relinquish the child. Finally, when mother wrote to the circuit court, she said "I would like to inform the court that I have *revoked* my consent to have my child adopted!!!" (Emphasis in original.) In the light of the evidence, we agree with the trial court that mother intended her November 1, 1989, writing to be a consent to the adoption.

Next, mother argues that, even if she consented to the adoption, her consent is invalid because it does not comply with Washington law, the state in which it was given. Washington law specifically requires that a consent to adoption be in writing, signed under penalty of perjury and approved by the court. RCW 26.33.160(4). The Stubbses concede that, if Washington law applies, mother's purported consent is invalid and the judgment is void. Oregon law does not require those formalities. Rather, ORS 109.312(1) merely requires that the consent be given "in writing."

■■ Mother asserts that, because of the differences in the states' laws, a choice of law problem exists. Relying on *Erwin v. Thomas*, 264 Or 454, 458, 506 P2d 494 (1973); *Casey v. Manson Constr. Co.*, 247 Or 274, 278-79, 428 P2d 898 (1967); and *Seattle-First National Bank v. Schriber*, 51 Or App 441, 448-49, 625 P2d 1370 (1981), she argues that we must evaluate whether Washington's and Oregon's interests and policies are "vitally involved" and which state has the most "significant relationship" with the parties and the child. There is no choice of law issue if, in a particular factual context, the interests and policies of one state are involved and those of the other are not or are involved in only minor ways. It is only if both states have substantial interests in having their law applied that we would determine which has the most "significant relationship." *Dabbs v. Silver Eagle Manufacturing Co., Inc.*, 98 Or App 581, 779 P2d 1104, *rev den* 308 Or 608 (1989). It would seem that Washington would have little interest in having its procedural requirements apply to an Oregon adoption proceeding involving Oregon residents and a child living in Oregon who has been voluntarily transferred there by the natural mother for the purpose of adoption. *But see In re adoption of MM*, 652 P2d 974 (Wyo 1982).

Neither party has cited, nor have we found, any case in which we or the Supreme Court have decided a choice of law issue in an adoption case.[3] Even if there is such an issue,

---

[3] Mother cites *Schultz v. First National Bank of Portland*, 220 Or 350, 348 P2d 22 (1960), as an adoption case that involved a choice of law dispute. In that case, the Oregon court enforced an agreement to adopt made in Nebraska, even though it was not enforceable under Oregon law, because the agreement did not violate any dispositive legal principle of justice in Oregon. We do not find that case helpful to the resolution of whether Washington's requirements for a valid consent should control in this case.

mother's reliance on tort and contract choice of law cases is misplaced. Regarding adoption cases, *Restatement (Second) Conflict of Laws* § 289 (1971), provides:

"A court applies its own local law in determining whether to grant an adoption.

"**Comment:**

"a. This rule is mitigated by the fact that under the local law of at least the great majority of states the welfare of the child is the most important factor that the court should consider in determining whether to grant an adoption.

"b. As to the circumstances in which a state has judicial jurisdiction to grant an adoption, see § 78."

This section suggests that, once jurisdiction has been decided in an adoption case, there is no choice of law problem.[4] *See* Scoles and Hay, *Conflict of Laws* § 16.4 (1984). The suggestion that local law will always apply in adoption cases because of the welfare of the child, an Oregon resident, has special appeal in this case. We have already determined that Oregon has significant contacts with the child and that it has jurisdiction under ORS 109.730(1)(b) to make a determination as to the best interests of the child. In the light of those facts, it would frustrate the purpose of the applicable Oregon law to apply a Washington statute that is inconsistent. For these reasons, we hold that the trial court properly applied Oregon law, and that the consent executed on November 1, 1989, is valid.

Next, mother argues that, if we find that she consented to the adoption, then she legally revoked her consent before the adoption judgment was issued.[5] The Stubbses argue that mother did not legally revoke her consent and that, moreover, she is estopped from revoking it. In *H. and H. v. O. and W.*, 28 Or App 887, 889, 561 P2d 1038 (1977), we said:

"A natural parent who has consented to adoption may revoke consent at any time before the court has issued a

[4] *See In re Adoption of C.L.W.*, 467 So 2d 1106 (Fla App 1985); *K.N. v. Cades*, Pa Super 555, 432 A2d 1010 (1981); *In re Adoption of MM, supra.*

[5] Mother also argues that her consent is invalid, because the Stubbses failed to disclose the fact that Yvonne had a "serious psychiatric disorder." Our review of the evidence shows that Yvonne suffered from nothing more serious than job stress, and we agree with the trial court that her condition has no serious effect on her parenting abilities.

decree of adoption unless circumstances indicate that the parent should be estopped to revoke the consent."

■ A parent who consents to adoption may agree before or after she gives consent that her consent shall be irrevocable. ORS 109.312(2)(a). If such an agreement is made, then the consent may not be revoked unless fraud or duress is proven. ORS 109.312(2)(b). Although mother did not make such an agreement, that does not mean that the court is required to allow her to revoke her consent. *Aultman v. McCracken*, 104 Or App 266, 269, 799 P2d 1148 (1990). We turn to the Stubbses' argument that "a withdrawal or revocation of consent must be a specific and particular filing with the court."

In *Dugger et ux v. Lauless*, 216 Or 188, 338 P2d 660 (1959), at issue was the manner in which consent to an adoption must be withdrawn in order to be effective. The court acknowledged that a formal revocation of consent filed with the court sufficed, but said:

> "It would seem equally clear that if the proceeding has been instituted the natural parent could not effectively withdraw consent simply by an extrajudicial notification to the adoptive parents." 216 Or at 193.

It then held that a statement of revocation made by the natural mother to the preparer of a report who included the statement in the report filed with the court was sufficient to revoke consent. The court said:

> "Although the trial court was not required to accept as true everything that was stated in the report, it had a clear warning that the respondent may have withdrawn her consent to the adoption, and this was notice of a very material fact because consent was essential to the court's jurisdiction over the matter. We agree with the trial judge that under these circumstances the proceeding should not have continued until a citation had been issued to the respondent so that she would have an opportunity to express her objection to the adoption." 216 Or at 194. (Citation omitted.)

■ We understand the holding in *Dugger* to mean that, to be effective, a revocation of a consent to adoption must in some manner give notice to the trial court that the consent is revoked. In April, 1990, mother told a representative of the agency that was preparing a report for Children's Services

Division that she did not want to give her child up for adoption. That statement was incorporated into the report, which was filed with the court on April 25, 1990. Also, although mother did not file a formal revocation of consent with the court, she wrote a letter to the circuit court judge who initially appointed the Stubbses as the child's temporary guardians, saying that she wanted her child back. We hold that, under the circumstances, mother revoked her consent unless she was estopped.

 Estoppel by conduct in an adoption case occurs when a person may be precluded by her conduct or silence from asserting a right which she otherwise might have had when it is her duty to speak. The conduct must result in detrimental reliance by the person claiming the benefit of an estoppel. A number of factors should be considered in making this determination, including

"circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties, between the giving of consent and the attempted withdrawal; whether or not the withdrawal of consent was made before or after the institution of adoption proceedings; the nature of the natural parent's conduct with respect to the child both before and after consenting to its adoption; and the 'vested rights' of the proposed adoptive parents with respect to the child." *Williams et ux v. Capparelli*, 180 Or 41, 45-46, 175 P2d 153 (1946).

Another consideration that may be significant is the relative abilities of the adoptive and natural parents "to rear the child in the manner best suited to its normal development." 180 Or at 46.

 As previously expressed, the series of events that resulted in the Stubbses obtaining custody of the child was initiated by mother. Because of mother's contact with Phillips, the Stubbses went to Washington, took custody of the child and returned to Oregon to initiate the adoption proceeding. Moreover, mother did not seek to revoke her consent before the petition for adoption was filed. Rather, she called to tell the Stubbses that there was a possibility that the child's natural father might want the child back. It was only after the adoption proceeding had been commenced as contemplated by the parties, and the child had been with the Stubbses for

three months, that mother sought to rescind the agreement. As a result of mother's conduct, the Stubbses brought the child home, treated her as their own child, invested their energy and financial resources in her well being and initiated the adoption proceeding at their cost.

Mother argues that the Stubbses only had the child for three months, which is a reasonable period of time within which to revoke her consent. In *D.M.C. and G.T.C. v. C.B.J.*, 35 Or App 833, 583 P2d 22 (1978), we decided whether a natural mother who had knowingly and voluntarily given her child up for adoption could revoke her consent approximately three months after the child had been released to live with the adoptive parents. We said:

> "If adoptive parents are to be expected to make the full commitment which is vital to the child's welfare, the consent of the natural parent or parents must at some point become final. We agree with the trial court that under the circumstances that point was reached prior to appellant's attempted revocation." 35 Or App at 850. (Footnote omitted.)

Likewise, under the circumstances of this case, we conclude that that point was reached before mother's attempted revocation. Mother should not be permitted to renege on her initiated and carefully conceived plan to have her child adopted when the Stubbses have relied on her proposal to their detriment. Moreover, the child's best interests now dictate that she remain with the Stubbses. Because of these circumstances, we hold that mother is estopped from revoking her consent. The trial court did not err when it granted the adoption.[6]

Affirmed.

**LANDAU, J.,** dissenting.

The majority concludes that, because the child lived with the Stubbses in Oregon for three months, the trial court properly assumed jurisdiction over this case under the Uniform Child Custody Jurisdiction Act (UCCJA). In my view,

---

[6] Because we hold that mother consented to the adoption, we need not decide whether the trial court erred in finding that her consent was unnecessary under ORS 109.324, which provides that consent of a parent is not required when the parent has wilfully deserted or neglected the child without just and sufficient cause for one year before the filing of the petition for adoption.

that conclusion cannot be reconciled with the jurisdictional prerequisite of the UCCJA that the child and at least one contestant have "significant connection" with this state. Furthermore, I find no other basis in the law to override the statutory preference for the exercise of jurisdiction by the child's "home state," which, in this case, incontestably is Washington. Therefore, I respectfully dissent.[1]

The UCCJA, adopted by Oregon and codified at ORS 109.700 to ORS 109.930, provides four potential bases for the exercise of jurisdiction:

"A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

"(a) This state is the home state of the child at the time of commencement of the proceeding, or had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of removal or retention by a person claiming custody or for other reasons, and a parent or person acting as parent continues to live in this state;

"(b) It is in the best interest of the child that a court of this state assume jurisdiction because the child and the parents of the child, or the child and at least one contestant, have a significant connection with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

"(c) The child is physically present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

"(d) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (a), (b) or (c) of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that this court assume jurisdiction." ORS 109.730(1).

---

[1] Because I would resolve this case on jurisdictional grounds, I do not discuss the other issues addressed by the majority.

In addition, it expressly provides that physical presence of the child in this state "is not alone sufficient to confer jurisdiction." ORS 109.730(2).

In this case, there can be no debate that Oregon is not the child's home state. The UCCJA defines "home state" as

"the state in which the child, immediately preceding the time involved, lived with the parents of the child, a parent, or a person acting as a parent, for at least six consecutive months * * *." ORS 109.710(5).

At the commencement of this proceeding, the child had lived in Oregon only three months, short of the six months required to establish jurisdiction in Oregon as the child's home state. The child did, however, live with a parent or a person acting as her parent in Washington for eight consecutive months before the commencement of this action. That makes Washington the home state for the purposes of determining jurisdiction under the UCCJA. Because the UCCJA gives preference to home state jurisdiction, I would end the inquiry at that point. *See Plas v. Superior Court*, 155 Cal App 3d 1008, 1014, 202 Cal Rptr 490 (1984); *Hattoum v. Hattoum*, 295 Pa Super 169, 175, 441 A2d 403, 405 (1982).

The majority concludes that, even though Oregon is not the child's home state, jurisdiction may be asserted under the "significant connection" test of ORS 109.730(1)(b).[2] The "significant connection" test, however, is a very narrow one. As the Commissioner on Uniform State Laws commented on

---

[2] The majority states that it does not matter that Washington is the child's home state, because the UCCJA provides for concurrent jurisdiction, when there is a significant connection with another state. That observation, however, misses the point. Although the UCCJA certainly contemplates the possibility of concurrent jurisdiction, it also contemplates a definite priority of bases for assuming jurisdiction, and home state jurisdiction is clearly the "preferred" basis. The Commissioner on Uniform State Laws stated that preference in the following terms:

"In the first place, a court in the child's home state has jurisdiction, and secondly, *if there is no home state or the child and his family have equal or stronger ties with another state*, a court in that state has jurisdiction." Comment, 9 *Uniform Laws Annotated* 144 (1988). (Emphasis supplied.)

Similarly, a substantial body of case law recognizes the preference for home state jurisdiction, absent a "compelling justification" for asserting jurisdiction on another basis. *E.g., Hafer v. Superior Court*, 126 Cal App 3d 856, 867, 179 Cal Rptr 132 (1981); *Plas v. Superior Court, supra*, 155 Cal App 3d at 1014; *Hattoum v. Hattoum, supra*, 295 Pa Super at 175; *In re McDonald*, 74 Mich App 119, 129, 253 NW2d 678 (1977); *see also* Haralambie, *Handling Child Custody, Abuse and Adoption Cases* 15 (1993).

this particular section of the UCCJA, the section must be read in connection with the statutory statement that mere presence in the state is insufficient to establish jurisdiction:

"Paragraph [b] of subsection [1] is supplemented by subsection [2] which is designed to discourage unilateral removal of children to other states and to guard generally against too liberal an interpretation of paragraph [b]. *Short-term presence in the state is not enough* even though there may be an intent to stay longer, perhaps an intent to establish a technical 'domicile' for divorce or other purposes.

"Paragraph [b] perhaps more than any other provision of the Act requires that it be interpreted in the spirit of the legislative purposes [of the Act]. The paragraph was phrased in general terms in order to be flexible enough to cover many fact situations too diverse to lend themselves to exact description. *But its purpose is to limit jurisdiction rather than to proliferate it.* The first clause of the paragraph is important: jurisdiction exists only if it is in the child's interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state. The interest of the child is served when the forum has optimum access to relevant evidence about the child and family. *There must be maximum rather than minimum contact with the state.*" Comment, 9 *Uniform Laws Annotated* 145 (1988). (Emphasis supplied.)

Consistent with that policy, Oregon courts have required that, to establish jurisdiction under ORS 109.730(1)(b), the child and at least one contestant must have a "significant connection" with Oregon *and* there must be substantial evidence in Oregon concerning the child's care and relationship with others. If the child or the contestant does not have a significant connection with this state, the jurisdictional inquiry ends. *State ex rel Torres v. Mason*, 315 Or 386, 393, 848 P2d 592 (1993).

In this case, the majority concludes that the child has a significant connection with this state, on the basis of the three months that she had spent in Oregon before the commencement of this action, during which time "she was cared for daily by the Stubbses, developed a bond with them, and adjusted to a new home environment." 126 Or App at 600.

I do not understand how that amounts to more than mere short-term presence in this state, which the UCCJA

explicitly provides is insufficient to confer jurisdiction. Particularly in the light of the child's and mother's substantial contacts with the state of Washington, I find the majority's analysis hard to square with the requirement that jurisdiction is to be based on "maximum rather than minimum contact with the state."

The majority contends that there is also "substantial evidence as to [the child's] present and future care, training, and personal relationships in Oregon, including evidence of medical care and contact with members of the Stubbses' church." I find no such "substantial evidence," certainly not of the type that establishes "maximum rather than minimum contact" with Oregon.

The record reveals that the Stubbses treated the child as their daughter for three months, during which time they cared for, clothed and fed her. That is no more than evidence that the child was present in Oregon for that brief period of time. The record also shows that the Stubbses planned on "making sure that [the child] gets into preschool, gets into kindergarten and then gets through elementary school and into high school and then through college." That is not evidence of an 11-month-old child's present care and training.[3] There is evidence that the Stubbses took the child to a doctor for ear infections, although it is not clear from the testimony whether that medical care took place before or after the initiation of this action. There is evidence that the Stubbses took the child to church, although Mrs. Stubbs testified that for at least two of the three months they did that, the child would not "go to" any member of the church. In fact, the evidence reveals that the three-month period was a traumatic one for the child. According to Mrs. Stubbs's own testimony, for at least two months, the child would not sleep through the night, cried constantly and would repeatedly overeat to the point of vomiting, because of the separation from her Washington home. In my view, the record shows far less than the "significant connection" to Oregon that the

---

[3] It is evidence of the Stubbses' plans for the child's future care. However, evidence of future care is not sufficient to establish a child's connection with a state at the time of the commencement of a hearing. *Sullivan v. Sullivan*, 87 AD2d 42, 44, 451 NYS2d 851, 853 (App Div 1982).

UCCJA requires. Accordingly, I would find that Oregon lacks jurisdiction under ORS 109.730(1)(b).

The UCCJA offers a third basis for asserting jurisdiction, when the child is physically present in the state and the child has either been abandoned or is in need of emergency care or treatment. ORS 109.730(1)(c). No one asserts that as a basis for Oregon jurisdiction in this case.

There is finally a basis for asserting "default jurisdiction," which the trial court listed as an alternative ground for its conclusion that Oregon has jurisdiction over this case. However, that basis for asserting jurisdiction under the UCCJA applies only if no other state has jurisdiction or if another state has declined to exercise jurisdiction because this one is the more appropriate forum. ORS 109.730(1)(d); *see also State ex rel Torres v. Mason, supra*, 315 Or at 394. In this case, Washington—which has adopted the UCCJA—could assert jurisdiction, as the child's "home state." Indeed, that is the preferred basis for asserting jurisdiction under the UCCJA. Washington also could assert "significant connection" jurisdiction, on the basis of the child's and mother's eight months in that state, which included the exercise of jurisdiction by a Washington court over a juvenile dependency hearing involving the child. Moreover, there is no evidence that any other state has declined to exercise jurisdiction in favor of Oregon. I would hold that the trial court erred in asserting "default jurisdiction" under ORS 109.730(1)(d).