Argued and submitted September 17, 1993, affirmed April 13, 1994

In the Matter of the Adoption of
Lisa M. Latimer, Robert J. Latimer
and Vanessa A. Latimer, Minor Children.

Laurie WILSON
and John Glenn Wilson,
*Appellants,*

*v.*

Andrew MORENO,
Natural Father of Vanessa A. Latimer,
*Respondent.*

(91-AD-0045-ST; CA A78402)

872 P2d 434

Gerald A. Martin argued the cause for appellants. With him on the brief was Francis & Martin.

Steven K. Chappell argued the cause and filed the brief for respondent.

Before De Muniz, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

## LANDAU, J.

Laurie Wilson (mother) and John Glenn Wilson (stepfather) appeal from the judgment denying their petition for the stepparent adoption of mother's and Andrew Moreno's (father) child, Vanessa. We review *de novo*, ORS 19.125(3), and affirm.

Child was born on February 22, 1987, in California, before mother and father were married. Mother testified that, at the time, father "didn't want anything to do with [child]." Mother moved to Oregon in 1988, and father came to Oregon to visit in late 1989 or early 1990. Within a few months, father moved to Oregon, and mother and father were married on July 7, 1990. However, father left mother the next month and returned to California.

Father testified that, after he returned to California, he repeatedly tried to communicate with mother, but she would not respond to his letters. He could not telephone her to ask about child, because she had no telephone. He said that he sent her cash and money orders in amounts of $20 to $50 two or three times per month to help support her and her three children.[1] Mother testified that father sent her approximately $300 to $350 and that she spent about $250 of that money to obtain a divorce. Mother's petition for dissolution included no reference to the existence of any children. The dissolution judgment was entered January 16, 1991.

Father returned to Oregon to visit child in April, 1991. Before he went to mother's house, he stopped to visit mother's brother, Tim, who told father that mother had remarried. Father felt unwelcome when he arrived at mother's house. He talked with child for only about five minutes, while she sat on her grandmother's lap. Mother testified that she heard father tell child that "when she was old enough * * * she could make up her own little mind." Mother testified that she did not want father to have any contact with child

"because of our relationship. And he had his family in California and that's what was important. He had to take

---

[1] Two of mother's children are from a previous marriage. The trial court granted stepfather's petition to adopt those children.

care of them and support them. And his wife has been dying and deathly ill for about seven years now, according to him. For awhile you believe it.''

Father testified that stepfather came to his motel room after the visit and "came on real strong and I — like he was looking for a fight.'' According to father, stepfather said that he had read a letter that father had sent mother and that he had torn it up, along with the money order. Father thought that stepfather was referring to the letter and the money order that he had sent as a gift for the children at Christmas, but he was not sure. Stepfather admitted that he went to the motel, but he testified: "I don't know of any money orders.''

Father testified that he stopped sending money to mother after that visit. He also testified that he had been sending birthday cards and gifts to mother for all of mother's children, but that he stopped doing that, too, because the gifts were being taken away. Tim testified that, in 1990 or early in 1991, father brought some gifts to him and asked him to give them to the children. He said that, on one occasion, father sent sports caps for Tim's children and mother's children, but stepfather indicated that he did not want mother's children to have anything from father. Similarly, father sent letters to mother at Tim's address, but Tim sent them back undelivered. He testified that he was aware that at least one of those letters contained a money order.

"He sent the letter to me once and wanted me to give it to my little sister, which I told him I couldn't give stuff like that to them. But my kids — I have a little baby that's two years old too — my kids got a hold of the letter and opened it and there was a money order in there, but I didn't give it to them.

"* * * * *

"And then [father] came up later on and I just gave him the money back and told him please not to send me the money because I couldn't give it to my little sister and [it was] just creating problems for [me] familywise.''

At some time in 1991, father began sending letters and money for the children to their maternal grandmother. Mother admitted that father "was sending letters and stuff'' to her mother, but she contended that the money that father sent was to pay for $200 worth of telephone calls that he made

from grandmother's home in Oregon to his children in California in August, 1990, while mother and father were married.

Father returned to Oregon to visit child again three or four months after April, but stepfather met him outside the house, refused to permit him to visit and told him not to come around again. Stepfather then called the police. Father did not try to see child again before the petition for adoption was filed.

Mother and stepfather filed their petition for adoption on December 5, 1991. Father refused to consent to the adoption, and mother and stepfather argued that father's consent was not required, because he wilfully deserted child or neglected to provide her with proper care and maintenance for one year preceding the petition for adoption. The court concluded that stepfather and mother did not prove that father had wilfully deserted or neglected to provide child with proper care and maintenance, and it denied the petition. On appeal, mother and stepfather assign error to the trial court's conclusion.

Generally, in contested adoption proceedings, the adopting parents must establish either that the natural parent of the child to be adopted consents to the adoption or that a statutory exception to the consent requirement applies. ORS 109.312; *Zockert v. Fanning*, 310 Or 514, 518, 800 P2d 773 (1990). One statutory exception to the consent requirement is contained in ORS 109.324, which requires proof that the non-consenting parent

"willfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption * * *." ORS 109.324.

In *Eder v. West*, 312 Or 244, 266, 821 P2d 400 (1991), the Supreme Court explained that exception:

"[W]e interpret the 'wilful neglect' ground of ORS 109.324 to impose the following standard: During the year preceding the filing of the petition for adoption, did the non-consenting parent wilfully fail to manifest substantial expressions of concern which show that the parent has a deliberate, intentional, and good faith interest in maintaining a parent-child

relationship? All relevant evidence demonstrating the presence or absence of wilful neglect may be considered by the court. The court, however, may disregard incidental visitations, communications, and contributions. ORS 109.324.[24] The ultimate decision must be based on the totality of the evidence. The burden of proof rests upon the petitioner to prove by clear and convincing evidence the statutory grounds for dispensing with consent alleged in the petition.

---

"[24] 'Incidental' means occurring merely by chance or without intention or calculation; being likely to ensue as a chance or minor consequence; not receiving much consideration. Webster's Third New International Dictionary 1152 (Unabridged 1961)."

Mother and stepfather argue that father's visits, communications and contributions during the year prior to December 5, 1991, were merely "incidental." Father argues that he tried to maintain greater contact with child and if his visits, contributions and communications were, indeed, only incidental, it was the result of interference by mother and stepfather and not his own wilful neglect.

The resolution of those issues turns on which witnesses were truthful about the events that occurred in 1991. Although we review the record *de novo*, we give great weight to the trial court's findings, which are based on its assessment of credibility. *See Stubbs v. Weathersby*, 126 Or App 596, 603, 869 P2d 893 (1994). After a thorough examination of the record, we agree with the trial court's conclusions.

Three witnesses testified that, on several occasions, father sent money, gifts and letters to various family members in an effort to maintain contact with child. Mother admits that she and grandmother received payments from father, although they used the money for purposes other than child's expenses. That they used the money for other purposes, however, does not alter the fact that the payments were sent as contributions to child's support. Mother and stepfather admitted that they never wanted father to visit or send money and gifts to child. Those admissions tend to corroborate the testimony of father and mother's brother, Tim, that stepfather and mother intentionally thwarted repeated efforts by father to contribute to child's care and to

participate in child's life. Based on that evidence, we cannot say that mother and stepfather have met their burden to prove by clear and convincing evidence that father wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for child.

Affirmed.