Argued and submitted February 12, reversed and remanded September 1, 2004

FABRICATION & TRUCK EQUIPMENT, INC.,
a Washington corporation,
*Appellant,*

*v.*

Roger M. POWELL;
TaskMaster Equipment, LLC,
an Oregon limited liability company;
and Liberties Unlimited, Inc.,
an Oregon corporation,
both individually and as partners,
*Respondents.*

990676; A120008

96 P3d 1251

Neil H. Robblee argued the cause and filed the briefs for appellant.

Claud Ingram argued the cause and filed the brief for respondents.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Plaintiff appeals, challenging the trial court's allowance of motions for directed verdicts against plaintiff's claims for breach of contract, breach of warranty, and violation of the Washington Farm Implements Act (WFIA), RCW 19.98.008-19.98.912. As described below, we conclude that the court erred in withdrawing the breach of contract and warranty claims from the jury based on alleged deficiencies in plaintiff's proof of lost profits. Regardless of any such deficiencies, plaintiff presented legally sufficient proof of other types of damages recoverable under those claims. We further conclude that the trial court erroneously applied choice of law principles in granting a directed verdict against plaintiff's statutory claim—and, particularly, in determining that plaintiff's proof of that claim, which alleged a violation of the WFIA, must meet the qualitatively different, and more rigorous, requisites for recovery under an analogous Oregon statutory scheme. *See* ORS 646.415-646.455 (2001), *amended by* Or Laws 2003, ch 466, § 1. Accordingly, we reverse and remand for a new trial on all claims.[1]

■ A directed verdict is appropriate if, after viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *Rutter v. Neuman*, 188 Or App 128, 133, 71 P3d 76 (2003). We recount and review the facts consistently with that standard.

Plaintiff operates an agricultural equipment sales business known as Washington Auto Carriage (WAC) in Spokane, Washington. WAC's market extends to Washington, northern Idaho, and Montana. WAC has never engaged in business in Oregon.

---

[1] As described below, *see* 195 Or App at 76-77, in addition to its claims for breach of warranty, breach of contract, and violation of the WFIA, plaintiff alleged "claims" of "partnership," "agency," and "piercing the veil" against all defendants. In their answer, defendants acknowledged, in response to plaintiff's "piercing the veil" "claim," that all three named defendants are, essentially, one business operation and that, if any one of them were held liable, the others would be equally liable. Defendants similarly admitted the vicarious liability allegations of plaintiff's "agency" and "partnership" "claims."

Accordingly, after having allowed directed verdicts against the claims for breach of contract, breach of warranty, and violation of the WFIA, the court entered a judgment dismissing all of plaintiff's claims.

In August 1997, defendant Roger Powell was forming Task Master Equipment, LLC (TME), a tractor wholesale business in Millersburg, Oregon, and he sent a letter to WAC's president and general manager, Clifton King. In the letter, Powell invited WAC to become a dealer of Task Master brand tractors. Powell also sent a dealership application and a brochure describing the quality of the tractors. The brochure explained that the tractors were made in China but that final assembly and some modifications were performed in the United States; the tractors were described as "dependable," "strong," "trouble free," and easily repaired "with simple hand tools."

King was interested in Powell's dealership offer and, after some preliminary communications, he traveled to Oregon to meet Powell and test the tractors. After that meeting, in December 1997, Powell sent another letter to King, again inviting WAC to become a Task Master dealer. The following month, King decided to purchase four tractors from TME with the understanding that, to do so, WAC would be required to become a Task Master dealer.

On January 15, 1998, WAC ordered two 30-horsepower tractors from TME, paying $20,002.50.[2] On the same day, TME sent WAC a written dealership agreement. King refused to sign the agreement because he was concerned that the dealership territory established by the contract was too limited. He expressed his concerns to Powell, and, according to King, the two orally agreed to proceed with the dealership arrangement and to "work out" their remaining issues over time. King believed that WAC had become a Task Master dealer.

In February 1998, WAC received delivery of the two tractors that it had ordered, paying $430 in freight costs. Although the $20,002.50 purchase price included two loaders,[3] when the two tractors were delivered, only one was prefitted with a loader.

[2] At the same time, WAC also ordered two 40-horsepower tractors from TME. However, TME was unsuccessful in its efforts to acquire those two tractors, and WAC never received them. Plaintiff did not seek any damages relating to those two tractors, but, at trial, King testified that he believed that, in order to become a dealer, WAC was required to purchase a minimum of four tractors.

[3] A loader is a hydraulically operated accessory that attaches to the front of the tractor and can be used to lift and move gravel, sand, dirt, and the like.

Later in February 1998, King took one of the tractors to a "home and yard" show in Spokane, where it leaked oil. When King contacted Powell about the leak, Powell claimed that he was unable to send a service person to fix the problem and asked King to have his own employees work on the repairs. The problem was far from easily repaired "with simple hand tools." Indeed, Powell could not supply a necessary replacement part, and WAC's "ASE certified master mechanic" had to completely disassemble the tractor, expending 25 hours of labor, to fix the leak. Although WAC performed the repair work on the tractor, Powell assured King that TME would take overall responsibility for the problem. Despite the oil leak, WAC continued in its efforts to market the tractors, expending considerable money on advertisements and fliers directed to its customer base.

In July 1998, WAC sold that tractor to a customer for $13,500. Sometime after the sale, the purchaser called WAC to complain that the tractor had numerous problems, including an oil leak. King arranged to bring the tractor back, removed the loader, and placed it on the second tractor. He then delivered the second tractor to the customer. Soon after, the customer called to complain of numerous problems with the second tractor. In the meantime, King was in contact with Powell about the problems, and Powell arranged to bring a third tractor to the purchaser. That tractor, also, suffered from various mechanical defects and was inoperable. Ultimately WAC returned the purchaser's money and lost the sale. Still, Powell told King that TME would address the problem. Despite Powell's promises, however, King began to suspect that TME would never take responsibility for the defective tractors.

By March 1999, TME had not resolved the problems, replaced the tractors, or refunded WAC's money. That month, Powell told King that TME would not, in fact, fix the tractors and, when King demanded that TME return the purchase price, Powell refused. King then wrote to TME revoking acceptance of the tractors.

In April 1999, plaintiff filed this action. The operative complaint at the time of trial, plaintiff's fourth amended

complaint, alleged six claims for relief. The first claim, for breach of warranty, alleged that defendant sold WAC malfunctioning tractors knowing that WAC needed operable tractors to successfully market and sell ancillary agricultural products and implements and "was relying on it to provide farm tractors suitable for resale." Plaintiff sought damages in excess of $50,000, including return of the purchase price, freight costs, accrued interest, and lost profits. The second claim, for breach of contract, sought the same relief. Plaintiff's third ("piercing the veil"), fourth ("agency"), and fifth ("partnership") claims each alleged, with necessary variation, that each defendant shared the liability of any other defendant with respect to the underlying transactions. Plaintiff's sixth claim, brought under the WFIA, sought $27,000, representing the "fair market value of the [t]ractors," as well as $150,000 in damages for "loss of business" and "lost sales."[4]

The case was tried to a jury in September 2002. King was plaintiff's only witness. On the first day of trial, King testified to the facts recounted above and, as relevant to this appeal, also testified regarding several aspects of WAC's alleged damages. King first testified that WAC paid $20,002.50 for the two tractors and spent $430 on freight, and exhibits were admitted supporting that testimony. Next, King stated that TME's breach resulted in WAC's inability to secure another tractor dealership agreement and harmed WAC "to the amount of $250,000" between March 1998 and March 2003. He then testified that "separate and apart from" those damages, WAC suffered losses amounting to $78,170,

---

[4] Broadly speaking, the WFIA regulates the business relationship between dealers and suppliers of farm implements. The statutory scheme sets out in detail various prohibitions and allows a dealer to sue a supplier for damages "in any court of competent jurisdiction." RCW 19.98.140; *see also* RCW 19.98.100; RCW 19.98.120. Oregon has an analogous statutory scheme. *See* ORS 646.415 - 646.455.

For purposes of this appeal, as highlighted below, one distinction between the then-extant versions of the Washington and Oregon farm implement statutes is critical: To bring suit under the Oregon law, a dealer was required to prove the existence of a written dealership agreement, but under the Washington law, *either* an oral agreement *or* a written agreement was sufficient. *Compare* ORS 646.415(7) (2001) *with* RCW 19.98.010. That distinction has since been eliminated by statutory amendment. *See* Or Laws 2003, ch 466, § 1.

which represented combined losses attributable to not having attended two trade shows in 1999 and 2000. Finally, King testified that the $78,170 figure included $3,500 of net lost profits for each of the two tractors.[5]

During the presentation of plaintiff's case-in-chief, the court engaged in protracted colloquy with counsel on two matters. First, the trial court expressed considerable skepticism and concern as to whether plaintiff had sufficiently substantiated its claimed lost profits resulting from the lost sales of the two tractors, the lost future sales of tractors, and the lost sales of other items, *e.g.*, snow plows, at trade shows.[6] Second, the trial court expressed its belief that plaintiff's statutory claim, while alleging a violation of the WFIA, must, instead, satisfy the requirements of a claim under the analogous Oregon statutes—which, as noted, *see* 195 Or App at 77 n 4, required that the dealership agreement be in writing, unlike the WFIA, which provides that such an agreement may be either oral or written. *Compare* ORS 646.415(7) (2001) *with* RCW 19.98.010. That belief was, in turn, predicated on the court's assumption that, under a choice of law

---

[5] More precisely, King calculated the $78,170 figure by adding (a) the lost profits from the two Task Master tractors and (b) the estimated lost sales on various items WAC typically sold at such trade shows, such as snow plows, trailers, and tool boxes. King testified that without a tractor line to sell, WAC was precluded from attending the two shows.

King's testimony regarding lost profits on the two tractors was—at best confusing. Defense counsel objected to the testimony, arguing, "He's talking what is the profit, there is a gross profit and a net profit, and if you're going to go for damages, you've got to prove what the net profit is." Apparently accepting the objection, plaintiff's counsel continued questioning King on the matter and, ultimately, King testified that WAC's net lost profits, as he understood that term to be defined, totaled $3,500 for each tractor.

[6] For example, the court observed:

"I've got to tell you that if I was on a jury, I've got to tell you right now, and I was handed this [exhibit], I would ignore it. And the reason I would ignore it is because it's totally impossible to figure it out, half of it is unreadable and I would just be rather insulted that two days of my time have been taken to decide this case and the plaintiff in this case couldn't even reduce the critical issue of damages to a type-written piece of paper. Now I'm not saying that to criticize you, but what I'm saying is I think we've got a—I think that's just a real problem. If I can't even figure it out looking through it, I don't think a jury's going to be able to figure it out. I think that what it's going to come down to is they're either going to believe his testimony or they're not, but they're not going to be able to determine very much from this hand-written material, it's just too difficult to understand."

analysis, Oregon had the "most significant relationship" with the transactions.

At the conclusion of plaintiff's case, defendants made a variety of interrelated motions directed against the claims for breach of contract, breach of warranty, and violation of statutory protections for farm implement dealers. The procedural posture is convoluted, but, based on our review of the record, we understand that the trial court ultimately (1) dismissed plaintiff's breach of contract and breach of warranty claims based on its determination that plaintiff's proof of lost profits was so confusing as to be legally insufficient;[7] and (2) dismissed plaintiff's statutory claim because plaintiff had proved only an oral dealership agreement, and not a written agreement as required under Oregon statutes.

On appeal, plaintiff challenges both of those bases for dismissal. Plaintiff argues that, contrary to the court's determination, its evidence of lost profits was legally sufficient. Plaintiff further asserts that, in all events, the trial court erred in dismissing the breach of contract and breach of warranty claims in their entirety because plaintiff presented sufficient evidence substantiating other aspects of its claims, including the purchase price of the defective tractors and

---

[7] The court concluded:

"I feel like the Court has bent over backwards to extend every opportunity for the Plaintiff in this case to prove these damages. And I can tell you right now that no matter how I sit down and figure it, I am incapable, given what I have been presented in evidence, to figure out what the damages are. If I am incapable of doing it, I don't know how I can expect a jury to do it. So, the Defense motions are allowed.

"* * * * *

"Well, I'm just—I'm telling you, I have no idea how I would ever compute the damages in this case based on what you have presented as evidence. It is about as confusing a mess as you can imagine. * * * The bottom line is, it is confusing, it is contradictory, it is extremely difficult to figure out. And if the jury sees what I see, they're going to have to speculate to come up with a damages amount. There is no way that they can sit down with a pencil and paper and hard figures and just add and subtract and come out with a number and say, 'That's been proven.'

"* * * * *

"Well, I'm not going to argue with you. I agree that there is some certainty as to some figures, but as to the entire effort to arrive at a figure, there is not sufficient certainty but for the jury to speculate. And based upon that, the motions are granted, the case is dismissed."

related freight costs. Finally, with respect to its statutory claim, plaintiff asserts that the court's choice of law analysis was erroneous. In particular, plaintiff contends that, while the Washington and Oregon statutes are both designed to protect farm implement dealers from overreaching by suppliers, each state's statutory protections are limited to its own resident dealers—that is, a Washington dealer cannot obtain relief under the Oregon statute. Consequently, the court erred in applying the requirements of Oregon law to plaintiff's Washington statutory claim.

For the reasons that follow, we agree that, even assuming that plaintiff's proof of lost profits was deficient, plaintiff presented sufficient evidence of other recoverable elements of damages, precluding dismissal of the breach of contract and breach of warranty claims in their entirety. We further conclude that the trial court erred in its application of choice of law principles in assessing the sufficiency of plaintiff's proof of its statutory claim.

■ Where, as here, the allowance of the motion for a directed verdict was based on the insufficiency of proof of damages, "we will review to see if there is *a complete absence* of proof of damages." *Springer v. Haugeberg, Rueter, Stone & Gowell, P.C.*, 124 Or App 2, 5, 860 P2d 912 (1993), *rev den*, 318 Or 582 (1994) (citation omitted; emphasis added). Here, there was no such "complete absence." We understand—and, indeed, to some extent share—the trial court's frustration with the imprecision of some aspects of plaintiff's proof of damages. Nevertheless, even assuming, without deciding, that plaintiff's proof of lost profits was insufficient, the fact remains that plaintiff did present proof of other recoverable components of damage. As noted, King's testimony established that WAC paid $20,002.50 for the two tractors and an additional $430 in freight costs. That evidence would not have required the jury to engage in impermissible speculation or guesswork in awarding those items of damage. Consequently, regardless of the sufficiency of plaintiff's proof of lost profits, the court erred in granting directed verdicts against the claims for breach of contract and breach of warranty.

■ The trial court similarly erred in dismissing plaintiff's statutory claims under the WFIA. That error resulted from the trial court's incorrect application of choice of law principles and, particularly, its resort to a "most significant relationship" analysis.

Whatever the applicability of choice of law principles when a plaintiff asserts a statutory claim under the law of a nonforum state, there was no cognizable conflict between Oregon law and Washington law in this case. That is so because, while the WFIA is designed as a sort of farm implement dealer "lemon law," to protect Washington resident dealers of farm implements, *see* RCW 19.98.100 (describing statutory purpose); RCW 19.98.120 (prohibited conduct); RCW 19.98.140 (dealer remedies), the analogous Oregon provisions are designed to protect only Oregon resident dealers. *See* ORS 646.415(6) (2001) (defining "retailer" as "any person engaged in the business of retailing farm implements, machinery, attachments or repair parts within the State of Oregon"); ORS 646.415(7) (2001) (defining "retailer agreement" as, *inter alia*, a written contract between "a supplier and a retailer"); ORS 646.451 (2001) (describing remedies available to "[a]ny party to a retailer agreement").

Thus, plaintiff was not within the class of persons protected under the Oregon statutes and could not have obtained relief under those statutes. Given that plaintiff could not have invoked the Oregon statutes and, concomitantly, that Oregon has no interest expressed in its farm implement dealer statutes or otherwise, in regulating remedies available to nonresident retailers against Oregon wholesalers of farm implements, the court erred in requiring plaintiff to prove the existence of a written dealership agreement under ORS 646.415(7) (2001). *See generally Stubbs v. Weathersby*, 126 Or App 596, 604, 869 P2d 893 (1994), *aff'd*, 320 Or 620, 892 P2d 991 (1995) ("There is no choice of law issue if, in a particular factual context, the interests and policies of one state are involved and those of the other are not or are involved in only minor ways. It is only if both states have substantial interests in having their law applied that we would determine which has the most 'significant relationship.' " (citation omitted)).

Finally, we reject defendants' alternative argument that, even if the WFIA controls, plaintiff failed to prove recoverable damages under that statute. RCW 19.98.140 provides that a dealer may

> "bring an action against a supplier * * * for damages sustained by the equipment dealer as a consequence of the supplier's violation including requiring the supplier to repurchase at fair market value any data processing hardware and specialized repair tools and equipment previously purchased pursuant to requirements of the supplier, compensation for any loss of business, and the actual costs of the action * * *."

Defendants suggest, almost parenthetically, that there is insufficient evidence of the "fair market value" of the tractors, as well as the extent, if any, of "any loss of business."

We decline to consider those arguments. Before the trial court, defendants' arguments were predicated on the assumption that Oregon law controlled. Consequently, for example, defendants did not advance at trial—and have not developed on appeal—any cogent argument as to the meaning of "fair market value" under the WFIA or whether the tractors at issue here qualified as "specialized repair tools and equipment previously purchased pursuant to requirements of the supplier." Given the cursory nature of defendants' present arguments and the lack of a record permitting us to meaningfully assess those arguments, we will not address them.[8]

Reversed and remanded.

---

[8] We reject, without written discussion, defendants' other arguments on appeal. Further, given our disposition, we need not, and do not, address plaintiff's challenge to the trial court's failure to admit certain exhibits.